UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                      )
JWAINUS PERRY,                                        )
        Plaintiff                                     )
                                                      )
v.                                                    )        C.A. # 1:12-cv-12070
                                                      )
LUIS SPENCER, in his official and                     )
individual capacities, THOMAS                         )
DICKHAUT, in his individual capacity,                 )
ANTHONY MENDONSA, in his official                     )
and individual capacities, JAMES SABA,                )
in his official and individual capacities,            )
ABBE NELLIGAN, in her individual                      )
Capacity, CAROL MICI, in her individual               )
capacity, KRISTIE LADOUCER,                           )
in her individual capacity, THOMAS                    )
NEVILLE, in his official and individual               )
capacities, and PATRICK TOOLIN, in his                )
individual capacity                                   )
                                                      )
        Defendants.                                   )
_____)


**PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff Jwainus Perry for his Complaint states as follows:

**INTRODUCTION**

1.   The Plaintiff, Jwainus Perry, a prisoner in the Department of Correction's custody, was

     held in non-disciplinary segregation for 611 days without compliance with Departmental

     regulations, without due process, and ultimately without reason. Perry was confined to

     his cell for twenty-three hours a day, with almost no human contact or mental stimulation

     for years, and without the privileges afforded to other inmates. There was no time limit

     set on his seemingly indefinite status, no hearings held in his presence, no relief from his

     grievances or letters, and no adequate responses to years of inquiries from his attorneys.

The Defendants arbitrarily placed Mr. Perry on awaiting action status for out-of-state transfer based on a rumor that Mr. Perry was a gang member 10 years earlier.  Perry languished in solitary confinement for years, without recourse, and without legitimate reason.  Perry was moved out of state for 190 days despite that he had pending criminal litigation, contrary to departmental regulations. Then when he returned to Massachusetts, he was sent back to segregation, this time without any explanation, for months.

2.  Through his attorneys and on his own, Perry attempted time and again to convince the Defendants that he was incorrectly placed in segregation on "awaiting action status", and that he required review; his requests, letters and grievances were fruitless.

3.  Mr. Perry's existing mental health conditions were exacerbated by the long-term solitary confinement, and the Department's policy that precludes mental health workers from prescribing Mr. Perry's necessary medications.

4.  The conditions that Mr. Perry suffered were at least as harsh as those in the Departmental Segregation Unit (DSU), a unit created for non-disciplinary segregation, and yet, he was denied the benefit of those regulations. See 103 C.M.R. 421.01 et seq. This segregation placement without any formal process and without opportunity equal to that of other inmates violated Perry's clearly established constitutional rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

5.  Mr. Perry seeks compensatory, declaratory and injunctive relief for the deprivation of his rights as secured by the Constitution, laws and regulations of the United States and the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

6.  This action arises under the Constitution and laws of the United States.  This Court has subject matter jurisdiction over all claims arising under the United States Constitution, 42 U.S.C. §1983 pursuant to 28 U.S.C. §§1331 and 1343.  This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 1331, 2201 and 2202. This court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a).

7.  Venue lies in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b). The events giving rise to this action occurred in this District.

## PARTIES

8.  Plaintiff Jwainus Perry is a resident of the Commonwealth of Massachusetts who was, at all times relevant to the allegations in this Complaint, confined within the Massachusetts Department of Corrections. Mr. Perry is currently incarcerated at the Massachusetts Correctional Institution Shirley at 1 Harvard Road, Shirley, MA 01464.

9.   Defendant Luis S. Spencer is the Commissioner of the Massachusetts Department of Correction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of his employment. He is sued in both his individual and official capacities.

10. Defendant Thomas Dickhaut is the former Superintendent of Souza Baranowski Correction Center of the Massachusetts Department of Corrections during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of his employment. He is sued in his individual capacity.

11. Defendant Anthony Mendonsa was the Deputy of Classification at Souza Baranowski Correction Center during certain times relevant to this lawsuit and, at all times relevant to

this Complaint, was acting within the scope of his employment. He is sued in both his individual and official capacities.

12. Defendant James Saba was the Superintendent at MCI Cedar Junction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of his employment. He is sued in both his individual and official capacities.

13. Defendant Abbe Nelligan was the Deputy of Classification at MCI Cedar Junction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of her employment. She is sued in her individual capacity.

14. Defendant Thomas Neville was the Deputy Director of Classification for the Department of Correction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of his employment. He is sued in his official and individual capacities.

15. Defendant Kristie LaDoucer was the Director of Administrative Resolution for the Department of Correction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of her employment.  She is sued in her official capacity.

16. Defendant Carol Mici was the Assistant Deputy Commissioner of Classification for the Department of Correction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of her employment. She is sued in her individual capacity.

17. Defendant Patrick Toolin was a Correctional Program Officer at MCI Cedar Junction during certain times relevant to this lawsuit and, at all times relevant to this Complaint, was acting within the scope of his employment. He is sued in his individual capacity.

## STATEMENT OF FACTS

### Introduction

18. Perry was sentenced to Department of Correction custody on February 12, 2004 for a term of natural life in prison. Perry is currently appealing his conviction.

### Plaintiff's Confinement in Non Disciplinary Segregation

19. On December 10, 2010, Perry was taken out of a population block at Souza Baranowski Correction Center ("SBCC") without a hearing, and without a disciplinary action, and was placed in the Special Management Unit (the "SMU") on Awaiting Action Pending Investigation status ("AA status").

20. At that time, Perry learned from by the Inner Perimeter Security ("IPS") Officer Morales that another facility notified the IPS office that Perry's case was gang-related, which led to his segregation placement.

21. While held in segregation, on December 17, 2010, Perry had a classification hearing and received a 3-0 recommendation from the Board to be transferred from SBCC to MCI Concord. The Board recommended placement at MCI Concord because "after consulting with IPS it is felt that inmate Perry requires alternative placement from SBCC due to serious STG issues surrounding the Boston St gangs here at this institution. At that time, Perry had an Objective Point Base Score ("OBPS") of 8. (Exh. A to First Amended Complaint).

22. However, Perry was not moved to MCI Concord pursuant to the Board's recommendation. Instead, Perry remained in segregation on AAPI (awaiting action pending investigation) status. The Defendant Spencer's designee, in review of the Board's recommendation, decided to disregard the recommendation and screen Perry for out of state transfer due to alleged Security Threat Group ("STG") concerns.

23. Defendant Mendonsa informed Perry by form letter that he was held in segregation on awaiting action status "pending investigation" at least twenty times from December 13, 2010 through June 30, 2011.

24. Perry never received any information about the alleged investigation into his STG membership.

25. 103 CMR 423.08 currently requires, "The status of each inmate placed in a special management unit on administrative segregation or protective custody status should initially be reviewed by the superintendent or designee within 72 hours of placement. Thereafter, each inmate's status should be reviewed every seven days for the first two months and at least every 30 days thereafter by a classification committee or other authorized group." However, Perry did not receive any such reviews.

26. Perry was interviewed at the outset of his classification on awaiting action pending investigation (AAPI) status, and he denied gang membership. Otherwise, Perry was never interviewed during this "investigation."

27. On July 21, 2011, Perry was officially notified that he was on awaiting action status pending out-of-state transfer. Deputy Superintendent Mendonsa sent Perry this notification 223 days after he was placed in administrative segregation.

28. On July 28, 2011, Perry was transferred from SBCC non-disciplinary administrative

    segregation to MCI Cedar Junction 10 block, where he was held on non-disciplinary

    administrative segregation with other inmates who were indefinitely on AA status.

29. On March 23, 2012, Perry was transferred to the Connecticut Department of Correction.

30. Perry returned from the Connecticut Department of Correction on or about September 28,

    2012 and was immediately placed back in administrative segregation.

31. There was never an approval for his retention on neither Awaiting Action Status nor any

    review of his Administrative Segregation after his return from Connecticut. Perry did not

    receive any notice identifying the reason for his continued confinement in segregation.

32. On October 31, 2012, Perry was classified to be transferred to SBCC, and the board, with

    Board member Patrick Toolin, Chairperson Jennifer Markham, and Security board

    member Ronald Bergeron, overrode his medium security designation.

33. On November 27, 2012, the Supreme Judicial Court in LaChance v. Commissioner of

    Correction, 463 Mass. 767 (2012) held that the ten-month detention of the plaintiff State

    prison inmate in a special management unit (unit) on awaiting action status, in light of the

    restrictive conditions to which he was subjected in the unit exceeded the bounds of

    reasonable confinement in administrative segregation and gave rise to a liberty interest

    that was entitled to the protection of due process; further, the procedures followed by the

    Department of Correction were insufficient to safeguard that interest from abuse.

34. On February 13, 2013, while Perry remained in segregation without a hearing, Defendant

    Saba responded by letter to a letter from Attorney Tenneriello of January 24, 2013 where

    Tenneriello specifically cited LaChance.  Saba claimed that the Department had

    prioritized hearings based upon length in segregation.  Saba further claimed that Perry

was not entitled to departmental compliance with the DSU regulations. See attached Exh. A.

35. Perry remained in administrative segregation without a hearing until February 15, 2013.

**Perry's Attempts at Remedying his Erroneous Security Threat Group Designation**

36. Perry first orally learned of the alleged STG designation when he was moved to segregation in December of 2010.

37. When Perry requested information regarding this allegation, he received a response on February 7, 2011 from Paul Oxford, the Chief of Investigative Services, who claimed that Perry was notified on November 12, 2008 that he was identified as a STG member, and at that time he was required to dispute that within five days. Because Perry had not responded to this memorandum, the STG membership had verified. See attached Exh B.

38. Perry did not receive this memorandum in 2008, and Perry's alleged STG status did not result in administrative segregation until 2010.

39. Perry learned of this designation in December of 2010 because it resulted in his segregation on awaiting action status, pending investigation into his STG status.

40. On December 23, 2010, Perry's criminal appellate attorney Janet Pumphrey contacted IPS officer Nester Cruz by telephone and informed him that Perry's case was not actually gang related.

41. On December 23, 2010, Attorney Pumphrey wrote to Defendants Mendonsa, deputy superintendent, Tom Dickhaut, superintendent, and Robert T. Duval, acting commissioner, regarding Perry's segregation status. Attorney Pumphrey questioned holding Perry in segregation based upon a rumor from years prior that Perry had been a member of a gang. Attorney Pumphrey informed Defendants that the rumor, if the rumor

actually existed, was totally unfounded.  Finally, alleged gang membership is not grounds for administrative segregation, and as such Attorney Pumphrey requested that Perry be moved back to general population.

42. On February 8, 2011, Attorney Pumphrey wrote to Mendonsa, Dickhaut, Duval, as acting commissioner, and Defendant Mici of Classification and informed them that Perry had been held in segregation since three weeks after his transfer to SBCC. Attorney Pumphrey informed the Defendants that Perry was not a disciplinary issue, and the intention to move him out of state for a wholly false allegation of gang affiliation made years ago is a punishment not even inflicted upon SBCC's most problematic inmates. Attorney Pumphrey again requested that Perry be moved to general population.

43. On February 28, 2011, Perry wrote to Thomas Neville, the Deputy Director of Classification, and informed Mr. Neville of the actions that his attorneys had taken on his behalf to prove that he was not associated with a gang, and as such not a security threat requiring out-of-state transfer.  Mr. Perry enclosed a copy of his trial transcript, Volume 7, pages 31-33, in which the prosecutor specifically told the court that Mr. Perry's indictment was not alleged to be the result of any gang activity. Neville maliciously failed to correct the erroneous designation.

44. On April 20, 2011, Carol Mici, Assistant Deputy Commissioner of Classification, responded to Perry's letter from February 28, 2011 in which he informed the Department that he was not involved with a Security Threat Group. Mici responded to Perry that the classification of the Commissioner's designee was final and could not be appealed.

45. On June 9, 2011, Attorney Pumphrey wrote to Mici and again requested Perry's release from solitary confinement and reminded Mici that Perry's case did not involve gang activity.  Mici failed to act, and Perry remained in solitary.

46. Perry was never classified based upon STG allegations. The classification Board used override codes T (Institutional Negative Adjustment) and U (Relates to safe orderly operation of the facility), to override his placement to a lower security institution that did not have the same alleged security threats as SBCC.  See, e.g., Exh. M. to First Amended Complaint.

47. The Classification Board did not use override V for Perry's placement, which specifically permits the override of a lower security designation because of STG issues.  See Id.

**Perry's Requests for Due Process While Held in Non Disciplinary Segregation**

48. On December 23, 2010, Attorney Pumphrey wrote to Mendonsa, deputy superintendent, Dickhaut, superintendent, and Robert T. Duval, acting commissioner regarding Perry's segregation status.  Attorney Pumphrey informed Mendonsa, Dickhaut and Duval that Perry had been held in segregation for more than a month, without any disciplinary event, and that his Ritalin medication was being withheld from him as a result.  Attorney Pumphrey informed the Defendants that Mr. Perry's mental state had deteriorated while in segregation to the point that she believed he required immediate medical attention. Finally, as alleged gang membership is not grounds for administrative segregation, Attorney Pumphrey requested that Perry be moved back to general population at SBCC.

49. On February 11, 2011, Bonita Tenneriello, a Staff Attorney of Prisoners Legal Services, sent a letter to Superintendent Dickhaut and Deputy Mendonsa concerning the segregation placement of Mr. Perry.  Attorney Tenneriello requested that, due to Mr.

Perry's mental status and the possible detrimental effect of segregation placement on his mental health, that Mr. Perry be placed into population. Attorney Tenneriello reminded the Defendants of their obligation to adhere to DSU regulations requiring a hearing for administrative segregation status.

50. On February 15, 2011, Attorney Pumphrey wrote to Defendant Neville, advising Neville that she represented Mr. Perry in the appeal of his conviction and post-conviction motions in superior court. Attorney Pumphrey noted that Mr. Perry had been held in segregation since early December [2010] without the benefit of a hearing, and that the threats of out-of-state transfer violated Department policy and would impair Perry's ability to assist his counsel in pursuit of his constitutionally guaranteed right to appeal.

51. On May 3, 2011, Attorney Tenneriello again contacted Defendant Dickhaut raising the concerns regarding Mr. Perry's continued segregation status. Attorney Tenneriello noted that Mr. Perry remained in the SMU, and that he was actually classified to SBCC and not for out-of-state transfer. Attorney Tenneriello noted that the disciplinary segregation was long over for any disciplinary infractions that Perry had previously committed, and Perry was not currently under a Disciplinary Segregation Unit sanction or given any clear criteria for earning his way back into general population. Attorney Tenneriello did not receive a response.

52. On May 12, 2011, Attorney Pumphrey again contacted Defendant Mici and informed Mici that Mr. Perry had been held in segregation since just after his transfer to SBCC six months prior, despite that Mr. Perry was not involved in any disciplinary event, had not received a ticket, and had no notice of any charges against him. Attorney Pumphrey informed the Department that the continued hold of Mr. Perry in solitary confinement on

the basis of false allegations of gang affiliation many years prior is not grounds for administrative segregation. Attorney Pumphrey requested that the Department release Perry from solitary confinement.

53. On September 12, 2011, Perry wrote to Defendant Spencer and informed Spencer that, when he was transferred, he was told by prisoner officials that he was being brought from SBCC to a "DSU like unit" for inmates awaiting out of state placement, but that he would have the same privileges as in the DSU, including a TV, radio, fan and canteen food items. Since his arrival in this segregation unit, he had been deprived all privileges except a TV, and deprived more privileges than those inmates in the SMU for disciplinary infractions. Perry cited Haverty v. Commissioner of Correction, 437 Mass. 760 (2002) and requested, per the court's decision, that Spencer afford him the procedural protections provided to Departmental Segregation Units.

54. On October 4, 2011, Defendant and Deputy of Classification Abbe Nelligan admitted to Perry that she was aware that the reason that Perry was placed in segregation at SBCC no longer existed outside of SBCC, and that it was no longer necessary to screen him for out of state placement. However, Nelligan informed Perry that the only individuals who had discretion to change his status from awaiting action to general population were Thomas Neville and Carol Mici.

55. On October 5, 2011, Perry wrote to Commissioner Spencer again to address his placement in administrative segregation. Perry informed Spencer that he received a unanimous vote from the classification board, after consultation with IPS, that he be transferred from SBCC to MCI Concord on December 17, 2010. However, inexplicably the commissioner's designee, Lori Cresey, modified the decision and held him at SBCC

12

pending out of state transfer.  Perry understood that per regulations, the decision to

modify was final and could not be appealed. Perry, however, informed Spencer that the

decision was incorrect pursuant to regulations and cited 103 CMR 420. 08 (j) and stated

there are only three instances in which the Commissioner or his designee can modify a

classification hearing decision, and none of those applied to his circumstance.  Perry

further informed Spencer that he had pending criminal litigation, and according to DOC

regulations should not be transferred as he had an "unresolved issue of a criminal nature."

103 DOC 419.02.  Perry had written to Deputy Commissioner Madden and she had not

responded.  Perry requested assistance from Commissioner Spencer. Further, Perry

reminded Spencer that it is in violation of the DSU regulations to hold a prisoner in

segregated confinement for an indefinite period without the benefit of a hearing.

56. On November 23, 2011, Mici referred Perry's letters to Commissioner Spencer for

response. Mici stated that her office made a final determination to override the board's

recommendation that Perry be placed in medium security and decided that Perry should

be screened for out of state transfer due to security threat group concerns. Mici informed

Perry that the designee's decision is final and could not be appealed.  Thus, Perry's out of

state screen would continue and Perry would remain in segregation indefinitely.  Mici

claimed the Department was actively pursuing out of state placement.

57. On December 8, 2011, in response to an inquiry from Perry, Thomas Neville, the Deputy

Director of Classification, advised Perry that the Department was continuing to pursue

out of state placement for Perry while Perry remained in segregation.

58. On December 16, 2011,without counsel's presence, the Classification Board inexplicably

changed their earlier recommendation that Perry be placed in medium security despite

that Perry had a lower OPBS score, and no recent disciplinary infractions. The Board determined that his disciplinary history and need to demonstrate positive adjustment in a more secure general population required placement at SBCC.  Perry remained in administrative segregation at MCI Cedar Junction despite the Classification Boards decisions.

59. On December 23, 2011, Attorney Tenneriello again wrote to Superintendent James Saba and informed Saba that Perry had been held in segregation since December 2010. Attorney Tenneriello reminded Saba that Perry's Objective Point Based Score for Classification was 7, which should place him in medium security.  Attorney Tenneriello noted that Perry had been free of disciplinary reports for over 16 months.  Attorney Tenneriello requested that the Department follow the DSU regulations.

60. On December 29, 2011, while in 10-Block, Perry was engaging in a hunger strike with other persons who were on awaiting action status indefinitely. Perry and the other prisoners were subjected to planned forced moves by move teams, physical force and chemical agents, resulting in injury to Mr. Perry and other inmates. Perry wanted medical attention but was denied treatment, access to sick slips and grievances.

61. On January 9, 2012, Attorney White, a staff attorney at Prisoners Legal Services wrote to Superintendent Saba to address the use of force against Perry and others on December 29, 2011 for the hunger strike that the three prisoners began on December 26, 2011.  A move team used force to remove Perry from his cell to move him to the upper tier.  Perry was then moved to the Health Services Unit because of the injuries he received. Perry remained in the Health Services Unit, then to SBCC for the weekend before he was returned to segregation.

62. Once Perry was returned, Perry was told that he would not be placed on the tier designated for prisoners awaiting out of state transfer. Perry was placed back in the 10 block on the more restrictive, and more segregated tier.   In a letter written by Attorney White, she noted that the inmates were taken to the upper left tier of 10 block where there were only a few prisoners and none in cells close to them.  The tier where Perry was taken did not provide a television.  Further, after the move, Perry and the other two prisoners were denied access to their property.  Superintendent Saba responded on January 26, 2012, stating only that the move was for medical reasons.  The Disciplinary Report filed against Perry was closed administratively.

63. On December 19, 2012, Perry again wrote to Mici, and copied Luis Spencer, and Mary Heffernan on the letter. Perry again reiterated his concerns about his indefinite segregation for non disciplinary reasons and cited its direct effect on his ability to assist his counsel in his pending criminal litigation.  As he could not be placed in SBCC because of alleged threats to his safety, and the DOC was refusing to honor his request for another Massachusetts institution placement, Perry requested to be transferred to Maine where he would be allowed to do computer research to assist in his appeal.

64. On January 24, 2013, Attorney Tenneriello of Prisoners Legal Services wrote to Superintendent Saba. Attorney Tenneriello informed Superintendent Saba that Perry had been in administrative segregation at SBCC and at the 10 block unit at MCI-CJ from December 2010 to March 2012 and then again from September 28, 2012 to that present time.  Mr. Perry had not been given any hearings at which he could contest the basis for his segregation and was only given reviews pursuant to the special management regulations. Citing LaChance v. Commissioner of Correction, 463 Mass. 767 (2012),

Attorney Tenneriello requested that a hearing be held immediately. Attorney Tenneriello reiterated that Perry had not received a disciplinary report in over 3.5 years, and he was entitled to be in a medium security institution due to his classification status.

65. On February 15, 2013, Perry was designated out of administrative status and to MCI Shirley Medium where he has remained disciplinary incident free but where he lives in constant fear of returning to administrative segregation.

**The Departmental Regulations Regarding Out-of State Transfer Denied Perry Due Process And Did Not Authorize Perry's Prolonged Segregation**

66. 103 CMR 430.21(2) states that an inmate under investigation for possible disciplinary offenses shall be charged with the disciplinary offense or released from awaiting action status within 90 days of placement on awaiting action status. Perry was under investigation at the outset for STG activity. The Superintendent may not exceed this time limit except in extraordinary circumstances. Perry did not receive any review by the Superintendent for exceeding the 90-day placement on awaiting action status while pending investigation for STG activity.

67. Further, 103 DOC 419 was promulgated to establish Department policy and procedure regarding transfer between states.

68. The regulation states that the Deputy Commissioner of Classification, Programs and Reentry Division, the Director of the Classification Division and the Superintendents for implementing and monitoring the policy.

69. In order to be eligible for transfer, section 419.02 states that the following factors normally preclude consideration of interstate or federal transfer: (A) any unresolved issues of a criminal nature; (B) at the discretion of the Commissioner or a designee.

70. While Perry had pending criminal appellate litigation, he was transferred to Connecticut from March 23, 2012 through on or about September 28, 2012. Perry spent approximately 190 days in Connecticut, deprived of contact with his attorney, his family, and access to Massachusetts case law.

71. Perry had a constitutional and statutory right to appeal his conviction, which had not yet been afforded when he was transferred out-of-state.

72. Perry's direct appeal had been stayed and his appellate counsel was preparing a Motion for a New Trial, which constituted an "unresolved issue of criminal nature."

73. Perry attempted to remedy this improper designation a number of times while incarcerated.

74. On May 25, 2011, Mr. Perry wrote a letter to Mici to address his concerns regarding out-of-state transfer and the conflicting information being provided to Perry by the SBCC administration.  Mr. Perry informed Defendant Mici that on May 6, 2011, that he learned Dickhaut had told Mici that it seemed unlikely that Perry would be moved out of state. But, on May 9, 2011, Dickhaut informed Perry that Mici's approval was required before Perry could be released from segregation.  Thereafter, Perry received a Mental Health evaluation and his out of state transfer approval was then issued.  Mr. Perry noted that he had not had any disciplinary issues that led to his 6-month segregation, and that he had pending state litigation that should make him ineligible for out-of-state transfer.  Mr. Perry asked for assistance with his out-of-state transfer.

75. On June 13, 2011, Mici responded to Mr. Perry's letter and indicated that the Commissioner's designee had approved Perry's out of state screening and that institutional staff would notify him once he was accepted by a receiving state.

76. Defendant Mici told Perry she did not interpret the Department's regulations, stating that "any unresolved issues of a criminal nature" precluded placement out of state, did not preclude Perry's out-of-state placement because the regulation did not apply to unresolved criminal appellate proceedings. 103 DOC 419.02.

77. On October 2, 2011 and October 17, 2011, Perry wrote to Commissioner Spencer and informed the DOC that it was in violation of 103 CMR 420 when it assigned him for out of state screen.

78. On January 25, 2012, Perry wrote to Defendant Neville, the Deputy Director of Classification to address his frustration that 13 months after he had been transferred to segregation, the DOC had for the first time attempted an out of state transfer to Virginia. Perry repeated that he had an OPBS of 7 and had been D-report free for 18 months. Perry reiterated that he has no conflict issues outside of SBCC but he was still being screened for out of state placement. Perry copied on his letter Secretary Mary E. Heffernan, Defendant. Spencer, Defendant Mici, his attorney and his family members.

79. On February 7, 2012, Attorney Pumphrey wrote to Mr. Neville and thanked him for returning her phone call in which Mr. Neville informed her that Perry would have a new classification review. Attorney Pumphrey again requested placement in a facility of Massachusetts that did not involve segregation. Attorney Pumphrey reiterated, as she had many times, that Mr. Perry's criminal case for which he is incarcerated was far from finished. Attorney Pumphrey anticipated filing a Motion for a New Trial and then Perry's direct appeal. Attorney Pumphrey advised that it was absolutely imperative that she is able to visit him conveniently and imperative that he has access to a law library.

80. Despite his efforts, Perry was moved out of state while he had pending criminal litigation for 190 days.

**The Defendants Knew Due Process Protections Were Required Because The Conditions in the SMU Are Substantially Similar to the Conditions in the DSU**

81. The SMU is a traditional segregation unit run under the Special Management Unit regulations, 103 CMR 423.00 et. Seq.

82. While held in the SMU administrative segregation, Mr. Perry was held in solitary confinement. He was only able to leave his cell for recreation for 60 minutes per day, five days a week.

83. In the SMU, exercise was limited to the "recreation deck". While on the recreation deck, Perry was confined alone in a cage that is similar to a dog run.

84. Recreation in the SMU at both Walpole and SBCC is at times impossible due to bad weather because there is no indoor recreation space, and some of the cages on the recreation deck are exposed to the elements.

85. For recreation at the SMU at Walpole, all cages on the recreation deck are exposed to the elements.

86. In the SMU, Perry was forced to eat his meals alone in his cell.

87. In the SMU, Perry was permitted to receive only two one-hour visits each week, and these visits were "non-contact" visits. Each of Perry's visits occurred with a glass partition between Perry and the visitor.

88. Perry's personal property was limited while he was held in segregation in the SMU. Perry was only allowed to spend $20 in canteen funds per week on hygiene, non-food items.

89. In the 10-block SMU at MCI Cedar Junction, the hygiene items were very limited, and inmates cannot purchase the items that inmates in general population are permitted to

purchase.  Inmates cannot purchase combs, hair brushes, soap dishes, and can only purchase a very small amount of stamps.  Inmates also cannot purchase regular pens.

90. In the SMU, Perry was not permitted to participate in any collective activities, and was unable to participate in educational, vocational, or rehabilitative programming available to general population inmates.

91. However, in the DSU, an inmate is entitled to all property, and may be afforded the opportunity to work.

92. In the SMU, Perry was denied access to the law library and unable to do any of his own research or assist his counsel in any meaningful way in his pending criminal litigation. Perry's library privileges were limited to requesting two books for delivery to his cell on a weekly basis, along with occasional access to a "satellite law library."  This "satellite law library" was a small area with old books, which were often missing pages; there was no access to a computer to do research or write letters. The "satellite law library" does not contain any books that relate to criminal appellate issues. If an inmate requests delivery of books to his cell, he usually will not receive them.

93. While in segregation, Perry was denied his necessary Ritalin and Concerta medication, which had been prescribed and taken for his Attention Deficit Hyperactivity Disorder and that he had been taking since he was a child.

94. Each time he left his cell, his wrists were cuffed behind his back, his legs were shackled, and he had a two-guard escort.

95. In the SMU, Plaintiff Perry was forced to remain in his cell for twenty-three hours each day during the week, and twenty-four hours per day on weekends.

96. The rules and regulations of the SMU create a life at the SMU that is extremely more confining than the life led by a normal prisoner on a normal cellblock.

97. In addition to the severe limitations on property, in the SMU on September 8, 2011, acting superintendent Allison Hallet wrote to Perry concerning his August 21, 2011 letter and noted that she pre-approved possession of a watch and radio in Ten Block.  Despite Hallet's assurances, on December 21, 2011, Perry's Sony Radio was designated as property contraband, a disposal form was filled out, and the radio was taken.

98. The Massachusetts Supreme Judicial Court in Haverty compared the conditions in the DSU to the "East Wing" units at MCI-Cedar Junction.  In the East Wing, inmates have 90 minutes a day of communal recreation, five days per week in an exercise yard. Prisoners are entitled to two, one-hour visits per week. Prisoners are allotted up to two hours per week in the library and the opportunity to work cleaning their unit.  East Wing inmates could spend up to $30 per week on canteen.

**The Defendants Did Not Comply with the DSU regulations And Denied Perry Due Process**

99. DSU regulations govern non-disciplinary segregation units.  103 CMR 421.07, 421.09.

100.    A Departmental Segregation Unit (DSU) is intended to house a prisoner who's "continued presence in a general institution population would be detrimental to the program of the institution." 103 CMR 421.01.  The DSU regulations were drafted under court order to ensure that due process was afforded.  See Haverty, 437 Mass. at 744.

101.    The Departmental Segregation Unit (DSU) regulations provide that a prisoner may only be held in non-disciplinary segregation after a hearing before an impartial board, and a finding based on "substantial evidence" that the inmate poses a "substantial

threat" to safety or to the operation of the facility. See 103 CMR 421.09; 103 CMR 421.12.

102.     If DSU placement is considered, the inmate must be served in writing with a conditional release date of no longer than six months, absent extraordinary circumstances, and the conditions that will entitle the prisoner to be released from the DSU. 103 CMR 421.15.

103.     The regulations further provide that a prisoner may only be held in restrictive confinement in a DSU while awaiting a DSU hearing for no more than 15 days, or 30 days if the inmate is awaiting action on a disciplinary offense.

104.     The regulations provide that these limits may only be exceeded in limited circumstances by written approval of the Commissioner or his designee and an explanation and estimate of time remaining given to the inmate. See 103 CMR 421.08(3).

105.     Perry was never sentenced to DSU segregation.

106.     Perry was given no notice of a conditional release date from segregation or the conditions that he needed to comply with to entitle him to release.

107.     Perry was given no explanation for why he was held on awaiting action status in restrictive confinement beyond the time limits set by 103 CMR 421.08.

108.     While he was held in administrative segregation, Mr. Perry was never given a hearing pursuant to the DSU regulations, 103 C.M.R. 431.01 et seq. to determine whether he posed a "substantial threat" to himself or others sufficient to justify keeping him in segregation nor was he given privileges in accordance with those regulations.

**The Defendants Supervisory Roles Required that They Be Aware of Perry's Classification Status and Remedy His Unconstitutional Segregation**

109.    Pursuant to M.G.L. ch. 124, § 1 the Commissioner of Correction is required to maintain and administer the state correctional facilities, and determine at the time of commitment, and from time to time thereafter, the custody requirements and program needs of <u>each person</u> committed under his control.  The Commissioner may assign or transfer such persons to appropriate facilities and programs. Further, the Commissioner is required to investigate grievances and inquire into alleged misconduct within state facilities. The Commissioner is charged with making and promulgating necessary rules and regulations regarding classification, and, care and custody for all persons committed to correctional facilities.  Thus, Spencer as the Commissioner of Correction had the notice of Perry's non-disciplinary indefinite segregation, and the obligation to provide for his custody and control, and provide regulations that complied with his due process and equal protection rights.

110.    Further, pursuant to 103 CMR 430.21(2) an inmate under investigation for possible disciplinary offenses shall be charged with the disciplinary offense or released from awaiting action status within 90 days of placement on awaiting action status.  The Superintendent is the only person who can override this status, and this status may not exceed except for this time limit in extraordinary circumstances.

111.    Defendant Spencer, as Commissioner, was required by departmental regulation to know and understand the classification status and designation of the inmates under his custody and control. <u>See, e.g.</u>, 103 CMR 420. 08.

112.    Pursuant to 103 CMR 420.06, the institutional director of classification is the staff person who has been designated to oversee the classification process and the implementation of 103 CMR 420.00 at the institution.

113.     103 DOC 650, which was promulgated to establish guidelines for the

identification and treatment of inmates in need of mental health. This policy specifically

states that certain staff is responsible for implementation and monitoring of this policy,

including Superintendents and Defendants Dickhaut and Saba.

114.     Defendants Mici, Nelligan and Neville were involved in creating the

Commonwealth of Massachusetts Department of Correction's Male Objective

Classification Operational Manual, which was prepared in February of 2006. In fact, the

manual specifically thanked Defendants Mici, Nelligan and Neville for their efforts in

promulgating the manual.  This demonstrates familiarity and a supervisory role in the

creation of the classification regulations that denied Perry due process.

115.     Further, Defendant Ladoucer, as the director of administrative resolution, is a

member of the office of administrative resolution. In an article written by Defendant

Ladoucer, she stated, "It is the mission of OAR to provide inmates and concerned citizens

access to responsive systems that encourage respectful communication, facilitate

resolution of legitimate issues, and contribute to the improvement of agency operations.

The Office of Administrative Resolution is made up of the Communication Unit and the

Inmate Grievance Unit which report to the Director of Administrative Resolution."  See

attached Exh C. The grievance Unit is charged with implementing and overseeing the

formal grievance process and ensuring that inmate grievances are processed, investigated

and responded to in an objective and impartial manner and in compliance with policy.  Id.

**The Defendants Denied Perry Legal Assistance at His Classification Hearing**

116.     The Massachusetts regulations for a classification hearing confer procedural

protections upon inmates, including the right to be represented by an attorney.

117.    103 CMR 420.08(3)(b) permits representation by an attorney when an inmate is considered for transfer to a higher security facility.  This regulation further permits counsel to reschedule the hearing.

118.    The Code of Massachusetts Regulations specifically defines transfer to an out of state facility a "transfer to a higher security facility." 103 CMR 420.06.

119.    On December 6, 2011, Attorney Pumphrey wrote to Mr. Perry and stated that she requested a continuance of his December 17, 2011 classification hearing.  Defendant Toolin then called Attorney Pumphrey and told her that she could not attend.  Toolin specifically told Attorney Pumphrey that Mr. Perry was not being considered for transfer to a high security facility and as a result could not have an attorney present.  Per the regulations, however, Attorney Pumphrey noted that transfer to an out of state facility is considered to be "transfer to a higher security facility."

120.    On December 12, 2011, Attorney Pumphrey contacted Defendant Saba, Superintendent, Defendant Nelligan, of the Classification Division, and Defendant Toolin, a Corrections Program Officer,  by letter and informed them that she requested to appear at Perry's classification hearing. Attorney Pumphrey was informed that she would not be able to appear because of 103 CMR 420.08(3)(b). Attorney Pumphrey renewed her request because of his mental issues, and his need for advocacy.  Further, as Perry was still held in segregation on AA status, Attorney Pumphrey noted that if an out of state facility was considered, according to 103 CMR 420.06, this was considered a higher security transfer entitling Perry to legal representation.

121.    In response, Attorney Pumphrey was orally told that she would not be permitted on the compound by Defendant Toolin.

122.     Perry was denied counsel at his classification hearing on December 16, 2011, and despite assurances that Perry was not being considered for higher classification status, Perry's classification was changed from MCI Concord (medium security) to SBCC.

**The Defendants Denied Perry His Necessary Medications and the Necessary Care for His Mental Health Conditions**

123.     Prior to his prolonged administrative segregation, Mr. Perry's mental health diagnoses were bipolar and ADHD. However, the prolonged segregation deteriorated his mental health condition, which the Defendants have refused to acknowledge, recognize, or treat.

124.     Mr. Perry was diagnosed with ADHD and prescribed Ritalin when he began his incarceration.

125.     Mr. Perry's Ritalin was discontinued in or around November of 2008 and Doxepin was prescribed.  Mr. Perry filed a mental health appeal, requesting Ritalin, and noting that the Doxepin was not a substitute for the Ritalin, and was prescribed for his depression and insomnia, rather than ADHD.  However, Mr. Perry's requests were denied.

126.     When Mr. Perry was transferred to the Connecticut Department of Corrections in 2012, mental health re-evaluated and re-diagnosed him with Attention Deficit Hyperactive Disorder and Antisocial Personality Disorder after a psychiatric consultation and after recognizing the prior diagnosis in his mental health file.

127.     After his first period of segregation, Mr. Perry was also diagnosed with intermediate explosive disorder and impulsive disorder.

128.     After the evaluation in Connecticut, Mr. Perry was prescribed Ritalin, and in September of 2012, he was prescribed Concerta.

129.     Once Mr. Perry returned to the Massachusetts Department of Corrections, he was taken off of the Ritalin and Concerta without a further psychiatric consultation.

130.     Mr. Perry did not have access to a psychiatrist or physician before he was taken off of his necessary medications without tapering.

131.     Mr. Perry has informed his mental health clinicians that Concerta and Ritalin are the only medications that have not given him negative side effects. He has expressed that those medications have given him the ability to focus, and calmed his impulsivity.

132.     The Department of Correction has a pattern and practice of discontinuing prescribed medication because other inmates are abusing the medications.

133.     There are certain medications, though effective and necessary, which are systematically not provided by the Department of Correction because of concerns with overall inmate abuse of medication and not due to concerns relating to a specific individual.

134.     Without his necessary medications, Mr. Perry has difficulty thinking, learning, concentrating, and performing daily life activities normally.

135.     Mr. Perry was, however, prescribed Concerta on February 25, 2013 in the Massachusetts Department of Corrections.  A V. Thorsen signed a physician's order form for Mr. Perry, prescribing Concerta for one year in duration.

136.     Mr. Perry was never given the prescribed Concerta, as Mr. Perry learned that Thorsen's "supervisors" prohibited her from giving Perry that medication. Mr. Perry has not been provided any documentation to support this decision to override his mental health professional's determination that Concerta was necessary.

137.    Mr. Perry and his attorneys have repeatedly filed grievances and letters to Defendants regarding his access to necessary medications and his need to be free from constant segregation because of the negative effect such segregation had on his mental health conditions.

138.    Specifically on February 11, 2011, Attorney Tenneriello of Prisoners' Legal Services wrote to Defendant Dickhaut and informed him that "my office is concerned that segregation placement is detrimental to his mental health and welfare. I urge you to find safe and secure housing for Mr. Jwainus in the general population." See Exh. G.

139.    Additionally, in a letter to Deputy Commissioner of Classification Veronica Madden, on July 19, 2011, Mr. Perry's criminal appellate counsel requested release from SMU and his necessary medication because Mr. Perry's mental health was at risk in the SMU.  Attorney Pumphrey further informed Madden that Perry was completely hopeless and despondent.  Attorney Pumphrey requested that Madden intervene and place Mr. Perry in safe and appropriate housing in general population.

140.    While in segregation, despite his requests for housing and medication that complied with his mental health needs, Mr. Perry engaged in self-destructive and self-harming behavior.

141.    To curb his impulsivity without his medication and while in segregation unable to leave his cell, Mr. Perry would starve himself.

142.    Mr. Perry's current mental health workers have diagnosed him with PTSD following the long-term non-disciplinary segregation.

**His Erroneous Out of State Transfer Denied Perry Access to the Courts That Is Afforded to Other Inmates**

143.     Perry was transferred to Connecticut while he had a pending appeal to the Supreme Judicial Court and while his appellate counsel was preparing a Motion for a New Trial.

144.     Prior to his transfer to Connecticut, on February 7, 2012, Attorney Pumphrey wrote to Thomas Neville and again reiterated that it was "absolutely imperative" that Perry had access to a law library with Massachusetts case law because of his pending Motion for a New Trial and direct appeal.

145.     While in Connecticut, Perry did not have access to prison staff that was versed in Massachusetts's law and able to assist him in the preparation of and filing of meaningful legal papers.

146.     Perry was not given access to a law library or legal database that had Massachusetts or First Circuit law.

147.     In the Inmate Handbook at McDougal-Walker Correctional Institution in Connecticut, Schulman and Associates is listed as running the "Inmates' Legal Assistance Program" and is a state contracted private firm.

148.     When Mr. Perry contacted Schulman and Associates, the law firm that the inmate handbook referred Perry to for legal assistance, they responded by letter stating that they were not trained or certified in Massachusetts law.   See Exh. H.

149.     While counsel represented Perry, counsel was not able to visit Perry in Connecticut and provide meaningful representation.

150.     This transfer to Connecticut has delayed the filing of Perry's statutorily mandated direct appeal.

**Perry's Administrative Segregation Denied Perry of his Property**

151.    On October 16, 2011, Perry filed a grievance for an unlawful seizure of his legal

documents from his case file in his cell.  Prisoners are permitted to keep one cubic foot of

legal documents in their cells, and are routinely permitted to keep trial transcripts, grand

jury minutes, other reports, and photographs that were not of the victim or graphic in

nature.

152.    Sometime in December of 2011, Swanson deemed Perry's new Sony radio

contraband and seized it, despite knowing that it was pre-approved by the superintendent.

153.    Department regulation 403.14 specifically sets out the procedure for contraband

property, including notice and election of disposal by the inmate, which was not followed

for Perry's property.

**While Incarcerated, Mr. Perry Exhausted His Administrative Remedies**

154.    While incarcerated, Mr. Perry sought to resolve his issues using the internal

grievance procedure.

155.    Specifically, on January 6, 2011, Perry filed a grievance (#50783) stating that on

December 10, 2010 he was taken from the M-2 Orientation Unit and placed within the

Departmental Segregation Unit at the behest of IPS commander Nester Cruz for alleged

STG affiliation, based not on information from an informant source, but allegedly from

intelligence from MCI Concord.  The allegations dated back ten years.  Perry stated that

his attorney had personally contacted Cruz by telephone in December of 2010 and

informed him that Perry's case was not actually gang related.  Perry stated that the IPS

officers delegated by Cruz to investigate the matter, R. Morales, and W. Colon,

concluded that Perry should be released back into population.  However, Cruz had

refused to conclude the matter so that Perry could be released from the SMU.  Perry

requested that he be released back to general population, with an award for each day that

he was held in segregation unjustifiably.

156.    On January 31, 2011, Perry's grievance was denied. The CPO that denied the

grievance claimed Perry was pending a transfer to MCI Concord.

157.    Perry appealed the denial of the grievance, and noted that there was no CMR or

DOC policy that gave the administration authority to hold prisoners in administrative

segregation for an indefinite period for a non-disciplinary reason.  Rather, procedural

protections were required.  Perry again requested his immediate release.  On March 10,

2011, Defendant Mendonsa denied Perry's appeal.

158.    On April 10, 2011, Perry filed a grievance, #52189, stating that he had been held

in the SMU on pending investigation status since December 10, 2010 without violating

any departmental regulations.  Perry cited 103 CMR 430.21(2) and noted that he had not

received any documentation that his continued placement on this status had been

approved by the superintendent or Commissioner's office. Perry noted he had also not

received an estimate of how much longer he would remain on the status with supporting

reasons. The grievance was denied on May 10, 2011.

159.    On August 1, 2011, Perry filed a grievance, #54105, stating that he had been held

for 9 months in the SMU at SBCC on administrative segregation, and then he was

transferred to MCI-CJ where he had been told that he will be held indefinitely awaiting

out of state transfer.  Perry requested a hearing to determine whether he actually posed a

risk sufficient to justify segregation.  Perry requested an opportunity to challenge the

basis for his segregation.  Perry's grievance was denied on August 10, 2011.

160.     On August 13, 2011, Perry appealed a grievance (#54105) and informed the DOC that he was held in the SMU on administrative segregation status for an indefinite period, which is not allotted for in the DOC regulations and violates his procedural due process rights. On September 9, 2011, the grievance appeal was denied by acting superintendent Allison Hallet.

161.     Nearly eight months later, on April 5, 2012, after Perry had been moved out of state, Kristie Ladouceur, Director of Administrative Resolution affirmed the decision of the superintendent and concluded that Perry was properly housed in the SMU pending transfer pursuant to 103 CMR 423.08(1)(e).

162.     On October 16, 2011, Perry filed grievance # 55440 stating that his photos from discovery of his criminal case had been removed from his cell.  Perry asked that his legal documents be returned. The grievance was denied on October 20, 2011. Perry appealed on October 25, 2011.

163.     On October 16, 2011 Perry filed a grievance appeal stating that his rights were violated where prison officials failed to inform central headquarters that the reason he is being screened for out of state transfer do not exist.  Perry's grievance was denied by Defendant Saba on October 20, 2011 and Perry was informed on October 22, 2012. One year later, on October 22, 2012, Defendant Ladoucer affirmed the decision of Superintendent James Saba and determined that his issue was a "classification" issue and was not to be grieved.

164.     On December 31, 2012, Perry filed another grievance specifically citing Haverty and LaChance and specifically requesting a hearing under the DSU regulations.  Perry's grievance was denied.  On January 31, 2013, Perry appealed the denial of a grievance and

informed that his due process rights were being violated by the continued administrative

segregation.  Defendant Saba affirmed the denial of the grievance and claimed that Perry

had been properly held on 10 block for a reclassification decision.

**The Department Placed Burdens on Perry that It Did not Place on Other Inmates**

165.    Inmates incarcerated in maximum security institutions within the Department of

Correction are allowed out of their cells for as much as fifteen hours per day, and all day

on weekends.  These prisoners are allowed to interact with other prisoners throughout the

time outside of their cells. These prisoners eat meals in a "chow hall." These prisoners

are unrestrained by shackles while outside of their cells.

166.    Inmates in general population can retain a wide range of property, including a

television, a fan, a typewriter, a tabletop radio, a Walkman and headphones.  Inmates in

general population have access to a wide range of religious services and treatment

programs, educational programs and vocational programs.

167.    Mr. Perry was not permitted to have anything but a television, and the property

that he brought with him was deemed contraband and taken from him.

168.    Mr. Perry's ability to visit with his family and contact his counsel was

substantially limited while he was housed in administrative segregation, and while he was

placed out of state.

169.    Mr. Perry's access to legal materials, to a computer and to legal books was

substantially limited or non-existent.

170.    Other inmates incarcerated in maximum-security institutions within the

Department of Correction have canteen privileges that are approximately forty percent

more than those inmates who are incarcerated in administrative segregation.

171.     On information and belief, there are approximately 66 STG's identified by the Department, which encompasses approximately 1,680 members or suspected members.

172.     The majority of those identified or suspected gang members exist in general population.

173.     Further, as evidenced by the October 2012 declaration by inmates Nicholas Occhiuto and Jason Watson, other inmates incarcerated in MCI Cedar Junction were permitted to retain all of their legal materials, including crime scene photographs.  See Attached Exhs D, E.

174.     Further, as evidenced by the attached affidavit of inmate Jesse Scroggins, many inmates have identified enemies with whom they have previously had altercations, and these inmates are permitted to co-exist within an institution.  Mr. Scroggins averred that he has 21 identified enemies, and has had physical altercations with 19 of them. Mr. Scroggins is held in general population on the same side of the prison with some of these individuals.  Exh. F.

**<u>Damages</u>**

175.     Mr. Perry suffered emotional turmoil and discomfort as a result of being held in segregation, unable to have regular contact with other inmates, his attorney and his family.

176.     Beginning around the time of his SMU placement, Mr. Perry was denied medications that he had been prescribed since childhood.  Perry has significant difficulty functioning normally without his medications, and the lack of medications impaired his daily function.

177.     Mr. Perry suffered from depression, feelings of hopelessness, and a sense of

impeding emotional breakdown.  Mr. Perry had suicidal ideation while in segregation,

and starved himself to control his emotional response to the segregation.

178.     Mr. Perry experienced feelings of claustrophobia, extreme paranoia, loss of track

of time and dissociative episodes throughout his prolonged solitary confinement.

179.     Mr. Perry experienced some mental health problems for the first time during his

solitary confinement that he continues to experience.  His mental health workers

documented psychological distress, and while housed in segregation, his housing

situation exacerbated existing conditions.

180.     Mental health professionals documented Mr. Perry's high risk of self-injury and

possible suicide given "his level of hopelessness" because his housing issues would not

be resolved in the immediate future despite that he "can be classed to a medium security

setting."  Mental health professionals decided, "close monitoring of [Perry was] indicated

due to his long-term isolated in segregation."

181.     Since his long-term segregation and hopeless isolation, Mr. Perry has been

diagnosed with additional mental health conditions, including antisocial personality

disorder and PTSD.

182.     Without his necessary medications, Mr. Perry has had difficulty controlling his

impulses, and performing daily life activities.  Mr. Perry has difficulty thinking, learning,

and concentrating.

183.     As a result of these effects, Mr. Perry has been unable to assist his counsel in

preparation of his pending appeal.

184.     Mr. Perry lives in constant fear of returning to segregated confinement for non-disciplinary reasons.  This fear that he will be placed in segregation without a hearing for any period of time causes extreme emotional distress and turmoil.

## Count I

**Violations of the Fifth and Fourteenth Amendments to the United States Constitution
"Due Process"
(42 U.S.C. § 1983)
(Defendants Spencer, Dickhaut, Mendonsa, Saba, Nelligan, Mici, LaDoucer, and Neville)**

185.     All above paragraphs are incorporated by reference as if set forth fully herein.

186.     Defendants, under color of state law, have deprived Mr. Perry of his right to due process, as secured by the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, by: (a) requiring Mr. Perry to live for a significant period of time in non-disciplinary segregation, which imposed an atypical and significant hardship on Perry in relation to the ordinary incidents of prison life without affording him access to administrative procedures that were adequate to satisfy the due process clause of the United States Constitution and as mandated by the United States Supreme Court, (b) placing Perry on awaiting action status for an unreasonable amount of time without affording him access to administrative procedures that were sufficient to satisfy the Due Process Clause of the United States Constitution as mandated by the United States Supreme Court; (c) failing to provide process for Perry to review his erroneous awaiting action status  and / or for STG designation within departmental regulations.

187.     The Defendants denied Perry due process of law by capriciously transferring Mr. Perry out of state, confining him within segregation without process or legitimate purpose, repeatedly and unjustifiably confiscating his legal materials and personal items, frequently and arbitrarily denying him access to the law library, failing to provide internal

means for Perry to remedy his improper designations, and failing to investigate or fairly

consider his grievances and appeals. These wrongful acts and omissions constitute a

denial of due process, and denial of court access in violation of Mr. Perry's rights under

the Fifth and Fourteenth Amendments to the United States Constitution.

188.     As a direct and proximate result of the Defendants' conduct and the policy or

practice of the Department of Correction, as overseen and enforced by Defendants, Mr.

Perry suffered injuries as described above.

**Count II**

**Violations of the Fifth and Fourteenth Amendments to the United States Constitution
"Due Process"
(42 U.S.C. § 1983)
(Defendants Toolin, Saba and Nelligan)**

189.     All above paragraphs are incorporated by reference as if set forth fully herein.

190.     Defendants, under color of state law, have deprived Mr. Perry of his right to due

process, as secured by the Fifth and Fourteenth Amendments to the United States

Constitution and 42 U.S.C. § 1983, by: (a) failing to allow for legal counsel at a

classification hearing where Mr. Perry was considered for and ordered to a higher

security institution where counsel requested the opportunity to be present, and was denied

that ability and where the Code of Massachusetts Regulations affords Mr. Perry this right,

and (b) requiring Mr. Perry to continue to live for a significant period of time in non-

disciplinary segregation following this classification hearing, which imposed an atypical

and significant hardship on Perry in relation to the ordinary incidents of prison life

without affording him access to administrative procedures that were afforded by the Code

of Massachusetts Regulations and that were adequate to satisfy the due process clause of

the United States Constitution and as mandated by the United States Supreme Court.

191.     As a direct and proximate result of the Defendants' conduct and the policy or

practice of the Department of Correction, as overseen and enforced by Defendants, Mr.

Perry suffered injuries as described above.

**COUNT III**
**Violations of the Fourteenth Amendment to the United States Constitution**
**"Equal Protection"**
**(42 U.S.C. § 1983)**
**(Defendants Spencer, Dickhaut, Mendonsa, Saba, Nelligan, Mici, LaDoucer, Toolin and**
**Neville)**

192.     All above paragraphs are incorporated by reference as if set forth fully herein.

193.     Defendants, under color of state law, have deprived Mr. Perry of his right to equal

protection of the laws, as secured by the Fourteenth Amendment to the United States

Constitution and 42 U.S.C. § 1983, by placing restrictions on his movement and

institutional freedom, and restrictions upon his access to property and legal materials,

which are not placed on other similarly situated inmates.

194.     As a direct and proximate result of Defendants' conduct and the policy or practice

of the Department of Correction as promulgated, overseen and enforced by Defendants,

Mr. Perry suffered injuries as described above.

**COUNT IV**
**Violation of the Americans with Disabilities Act**
**42 U.S.C. §12101 et. seq.**
**(Defendants Spencer, Dickhaut, Mendonsa, Saba, Nelligan, Mici, LaDoucer, and Neville)**

195.     Plaintiff Perry restates and realleges all above paragraphs as if fully set forth in

this Count III.

196.     Plaintiff is a qualified individual with disabilities as defined in the Americans

with Disabilities Act ("ADA"). Since childhood, Perry has been diagnosed with and

treated for Attention Deficit Hyperactivity Disorder and Bipolar. His severe ADHD and

Bipolar disorders are mental impairments that substantially limit one or more major life activities, including but not limited to thinking, concentrating, learning, interacting with others, and controlling his behavior.   Plaintiff has been held in the custody of Defendants, and was initially treated for his ADHD. When Perry entered segregation, the Defendants denied him mental health treatment and / or has caused mental health to withhold his necessary medications. Mental health workers have prescribed Mr. Perry those medications, but those prescriptions have not been given and have been changed at the behest of supervisors.

197.     The Defendants on behalf of the Department of Corrections have engaged in a policy of causing mental health professionals to withhold certain medications not based upon the resolution of his medical issues, but based upon the inability to control drug distribution within the confines of the institutions. The Defendants continue to adhere to this policy of denying Perry his necessary medication despite Perry's repeated requests.

198.     After his long-term placement in segregation, Perry has been diagnosed with Antisocial Personality Disorder and PTSD among other mental health disorders.  Perry's mental health status prior to his long-term segregation made the risks of this long-term segregation apparent and damaging. His counsel, on his behalf, sought his release into general population so as to avoid further mental strain and damage, which was denied by the Defendants.

199.     As a state prisoner, Plaintiff meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by defendant DOC. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2).

200.     The DOC is a public entity as defined under Title II of the ADA, 42 U.S.C. § 12131(1)(B).

201.     The Defendants acting on behalf of the DOC knowingly and consistently discriminated against Plaintiff as a mentally disabled prisoner by failing to provide him with reasonable accommodation of necessary medication, and housing outside of long-term solitary confinement.

202.     The Defendants' (acting on behalf of the DOC) failures to provide Perry's necessary medication constitute discrimination against the Perry on the basis of his disability in violation of 42 U.S.C. § 12132.

203.     The Defendants' (action on behalf of the DOC) failure to provide appropriate housing constitutes discrimination against the Perry on the basis of his disability in violation of 42 U.S.C. § 12132.

204.     Discrimination against Perry as an inmate with mental illness occurs because he cannot receive mental health services and housing sufficient to stabilize his illness and enable him to control his impulses, and adequately communicate with and assist his attorneys.

205.     Defendants and the DOC have discriminated against Perry on the basis of his disabilities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a) Enter judgment for the Plaintiff and against the Defendants on all counts of this Complaint;

b) Award punitive and compensatory damages;

c) Declare the practice of holding inmates in segregation units without due process of law for indefinite periods unconstitutional and/or in violation of state and/or federal law;

d) Declare the practice of designating inmates as a member of a Security Threat Group and / or AA or AAPI status without a hearing at which the inmate can be heard, and a process for review when erroneous determinations have been made in violation of state and/or federal law;

e) Declare the practice of interfering with mental health and / or medical treatment providers by the Massachusetts Department of Correction, either by discouraging, precluding or denying the prescription of certain medications or other means of deterrence of necessary mental health treatment, a violation of state and federal law;

f) Declare the practice of housing mentally ill inmates on indefinite segregation for non-disciplinary reasons against the law and Constitution of the United States;

g) Enter a preliminary and permanent injunction requiring the Defendants, their agents, subordinates, employees and all others acting in concert with them to cease their unconstitutional and unlawful practices of interfering with Mr. Perry's access to necessary medications remedy their violations of the Constitution and Laws;

h) Enter a permanent injunction ordering the Defendants to provide due process to all inmates held within the Special Management Unit or other non disciplinary segregation unit;

i) Enter a permanent injunction prohibiting the transfer of inmates with pending appeals out of state until the completion of the statutorily mandated direct appeal.

j) Award the Plaintiff reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988;

k) and Grant such other relief as the court deems just and proper.

**JURY DEMAND**

A jury trial is hereby demanded.

Respectfully Submitted,
JWAINUS PERRY
By His Attorney,

/s/ Amy L. Codagnone
Amy L. Codagnone
107 Union Wharf
Boston, Massachusetts 02109
(857) 265-2166
Codagnone.Attorney@gmail.com
BBO # 679716

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party and upon any party appearing pro se by complying with this Court's directives on electronic filing.

Dated: April 30, 2014        Signed: /s/ Amy Codagnone

42