UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JWAINUS PERRY,
     Plaintiff,


     v.                             CIVIL ACTION NO. 12-12070-MPK[1]


LUIS S. SPENCER, in his official
     and individual capacities,
THOMAS DICKHAUT, in his
     individual capacity,
ANTHONY MENDONSA, in his official
     and individual capacities,
JAMES SABA, in his official and
     individual capacities,
ABBE NELLIGAN, in her
     individual capacity,
CAROL MICI, in her
     individual capacity,
KRISTIE LADOUCER, in her
     individual capacity,
THOMAS NEVILLE, in his official
     and individual capacities,
PATRICK TOOLIN, in his
     individual capacity,
     Defendants.


MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#100).

KELLEY, U.S.M.J.


    Plaintiff Jwainus Perry is a prisoner in the custody of the Massachusetts Department of

---

[1]

    With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (##119, 121.)

Corrections (DOC); defendants are officials and employees of the DOC.[2]  This Order addresses Count I of the second amended complaint (#51), the only count that survived defendants' motions to dismiss (#77), where Perry claims that in violation of 42 U.S.C. § 1983 he was unlawfully confined in non-disciplinary segregation for an unreasonable time without adequate process or legitimate purpose in violation of his Fifth and Fourteenth Amendment due process rights. (#51 ¶ 186.)

Defendants' motion for summary judgment has been fully briefed. (##100-102, 110-111, 115, 117.)  For the reasons set out below, the court finds that defendants are entitled to qualified immunity, therefore, defendants' motion is ALLOWED and judgment is to enter for defendants.

## I. Background.

Unless otherwise noted, the facts set out in this Order are not in dispute.  Since 2004, Perry has been an inmate incarcerated with the DOC, sentenced to life without parole for first degree murder. (#102 ¶¶ 1-2.)  Defendants assert that in 2010, after authorities received information that indicated that Perry was a danger to other inmates, he was placed on "awaiting action" status in a segregation unit, and remained there "pending investigation, pending classification, and then

---

[2]

The claims may go forward against defendants only in their individual, as opposed to official, capacities. *See Wang v. N.H. Bd. of Registration in Med.*, 55 F.3d 698, 700 (1st Cir.1995).  Further, relief in the form of money damages is the sole remedy that may be pursued.  (#77 at 15.)

The defendants are: Luis S. Spencer, Commissioner of the DOC at all relevant times; Thomas Dickhaut, former Superintendent of Souza-Baranowski Correctional Center (SBCC) from April 2007 through September 2011; Anthony Mendonsa, Deputy Superintendent of Classification and Treatment at SBCC from May 2005 through September 11, 2011, and then Superintendent at SBCC from September 11, 2011 through June 30, 2012; James Saba, Superintendent at MCI-Cedar Junction from September 2011 to the present; Abbe Nelligan, Director of Classification at MCI-Cedar Junction from 2003 until September 2011, and then Deputy Superintendent of MCI-Cedar Junction from September 11 through July 2013; Carol Mici, Assistant Deputy Commissioner of Classification for the DOC during certain relevant times; Kristie LaDoucer, Director of the Office of Administrative Resolution for the DOC and Departmental Grievance Coordinator at all relevant times; and Thomas Neville, Deputy Director of the County, Federal & Interstate (CFI) Unit at the Central Classification Division of the DOC from March 2008 to November 17, 2013 (#102 ¶¶ 3-12).

pending an out-of-state placement."[3] (#102 at 6.) Perry first was housed in a segregation unit at the Souza-Baranowski Correctional Center (SBCC) in Shirley, Massachusetts and then transferred to another segregation unit at the Massachusetts Correctional Institution (MCI) at Cedar Junction in Walpole, Massachusetts, for a total of approximately fifteen consecutive months (except for a ten-day break while he was in the health services unit after going on a hunger strike to protest being held in segregation for so long). After fifteen months in segregation, he was transferred to a prison in Connecticut for about six months, and then, upon his return to Massachusetts, was housed in a segregation unit at MCI-Cedar Junction again for an additional period of about five months.[4]

## II. Summary Judgment Standard.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Tobin v. Federal Express*

---

[3]

The DOC calls segregation units "Special Management Units" (SMU). The DOC defines an SMU as "[a] separate housing area from general population within institutions in which inmates may be confined for reasons of administrative segregation, protective custody or disciplinary detention." *See* 103 CMR 423.06. (#102 ¶ 48; #110 ¶ 48.) Notwithstanding the bureaucratic nomenclature, as Justice Kennedy has said, "administrative segregation" is better known as "solitary confinement." *Davis v. Ayala*, -U.S.-, 135 S.Ct. 2187, 2208 (2015) (Kennedy, J. concurring). The court will refer to such units as SMUs or segregation units in this Order.

[4]

Perry was held in segregation units at SBCC and then MCI-Cedar Junction from December 10, 2010 to March 22, 2012 for a total of 468 days and from September 28, 2012 to February 18, 2012 for a total of 143 days. (#102 ¶ 14a-j; #110 ¶ 14a-j.)

From 2010 to 2013, the time relevant to this action, his placements were as follows: from December 10, 2010 through July 28, 2011, in the SMU at SBCC; from July 28, 2011 through December 29, 2011, in the SMU at MCI-Cedar Junction; from December 29, 2011 through December 30, 2011, in the Health Services Unit (HSU) at MCI-Cedar Junction; from December 30, 2011 through January 2, 2012, in the HSU at SBCC; from January 2, 2012 through January 9, 2012, in the HSU at MCI-Cedar Junction; from January 9, 2012 through January 12, 2012, in the SMU at MCI-Cedar Junction; from January 12, 2012 through March 23, 2012 in the SMU at SBCC; from March 23, 2012 through September 28, 2012, in the custody of the Connecticut DOC; from September 28, 2012 through February 19, 2013 in the SMU at MCI-Cedar Junction; and on February 19, 2013, he was transferred to general population at MCI-Shirley. (#102 ¶ 14a-j; #110 ¶ 14a-j.)

*Corp.*, 775 F.3d 448, 450 (1st Cir. 2014) (internal quotations marks and citation omitted).  "[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is inappropriate "if the record is sufficiently open-ended to permit a rational fact finder to resolve a material factual dispute in favor of either side." *Pierce v. Cotuit Fire District*, 741 F.3d 295, 301 (1st Cir. 2014).

The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted).  A genuine issue of fact exists where a fact finder could find in favor of the non-moving party, "while material facts are those whose existence or nonexistence has the potential to change the outcome of the suit." *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (internal quotations marks and citation omitted).  "Once the moving party avers the absence of genuine issues of material fact, the non-movant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation marks and citation omitted).

In determining whether summary judgment is proper, evidence is considered "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

4

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (further internal quotation marks omitted)).

### III. Law.

### A. Due Process Claim.

The sole claim in this case is "that Perry was unlawfully confined in non-disciplinary segregation for an unreasonable time without adequate process and for no legitimate purpose."[5] (Order on Defendants' Motions to Dismiss #77 at 4-5.)  "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  In the context of prisoners' rights, the Supreme Court has determined "that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Wilkinson*, 545 U.S. at 221 (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).  That having been said, the Court has recognized "that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*." *Wilkinson*, 545 U.S. at 222 (citation omitted).

---

[5]

Perry also raised an issue concerning his not being given medication in Count I of the second amended complaint. Defendants argue "[i]n an abundance of caution" (#101 at 3 n. 4) that he cannot succeed on any due process claim that defendants impeded his access to medication because he did not exhaust his administrative remedies on this issue. (#101 at 3-5.) Perry does not discuss the claim in his opposition (#111) so the court need not address it.

In *Sandin*, the Court eschewed the approach adopted in *Hewitt v. Helms*, 450 U.S. 460 (1983) of examining the mandatory language of prison regulations in order to determine if a liberty interest had been created: "[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483 (1995); *Dominique v. Weld*, 73 F.3d 1156, 1159 (1st Cir. 1996) ("In *Sandin*. . . , the Court criticized its former precedent under which courts examined the language in state statutes and regulations to determine whether a liberty interest was created").  Instead, the Court refocused on "the nature of the deprivation," concluding

> we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause.  But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force,   nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin*, 515 U.S. at 481, 483 (internal citations omitted); *Wilkinson*, 545 U.S. at 222.[6]

### B. Qualified Immunity.

"Qualified immunity protects government officials from trial and monetary liability unless the pleaded facts establish (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Marrero-Mendez v. Calixto-Rodriguez*, - F.3d. -, No. 14-2030, 2016 WL 3902635, at *3 (1st Cir. July 19, 2016) (internal citations and quotation marks omitted).  Here, defendants argue they are entitled to the protection afforded by the doctrine of qualified immunity:

'[A] government official sued under § 1983 is entitled to qualified

---

[6]

There is no claim that the length of Perry's sentence was affected by his time in segregation, as he is serving a sentence of life without the possibility of parole.

immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.' *Carroll v. Carman*, - U.S. -, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014) (per curiam). 'This doctrine "gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."' *Id.* (quoting *Ashcroft v. al-Kidd*, - U.S. -, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011)) (internal quotation marks omitted).

*Hunt v. Massi*, 773 F.3d 361, 367 (1st Cir. 2014); *Stamps v. Town of Framingham*, 813 F.3d 27, 33-34 (1st Cir. 2016) ("'The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Mullenix v. Luna*, - U.S. -, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam)" (further internal citation and quotation marks omitted)).

The First Circuit recently reviewed this doctrine and said:

> This court adheres to a two-step approach to determine whether a defendant is entitled to qualified immunity: 'We ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."' *Mlodzinski* [*v. Lewis*], 648 F.3d [24], 32 [(1st Cir. 2011)] (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.2009)). The second prong, in turn, has two elements: 'We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right.' *Id.* at 32-33.

*Stamps*, 813 F.3d at 33-34; *McCue v. City of Bangor, Maine*, - F.3d - , No. 15-2460, 2016 WL 5349730, at *7 (1st Cir. Sept. 26, 2016); *Miranda-Rivera v. Toleda-Davila*, 813 F.3d 64, 72 (1st Cir. 2016). "If either of the two prongs is not met - i.e., if the facts do not show a constitutional violation or the right in question was not clearly established - the officer is immune. Either prong may be addressed first, depending on the circumstances in the particular case at hand." *Marrero-Mendez*,

2016 WL 3902635, at *3 (internal citation and quotation marks omitted); *Raiche v. Pietroski*, 623 F.3d 30, 35 (1st Cir. 2010) ("These two prongs of the analysis need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense").

With regard to the first prong, "[t]he test for a procedural due process violation requires the plaintiffs to show first, a deprivation of a protected ... interest, and second, a denial of due process." *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008); *Hudson v. MacEachern*, 94 F. Supp.3d 59, 69 (D. Mass. 2015) (citing *Wilkinson*, 545 U.S. at 221) ("In order to state a claim for a procedural due process violation, a plaintiff must point to an interest in life, liberty, or property of which []he has been denied"). Thus one circles back to the test set out above in *Sandin,* 515 U.S. at 481, 483: regarding prisoners' rights, "[a] liberty interest is defined as a change that creates an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Schofield v. Clarke*, 769 F. Supp.2d 42, 48-49 (D. Mass. 2011) (internal citation and quotation marks omitted); *Tyree v. Weld*, No. CIV. 93CV12260-NG, 2010 WL 145882, at *7 (D. Mass. Jan. 11, 2010) (" Whether a restrictive condition imposed on a prisoner implicates a liberty interest depends upon whether the restraint imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" (internal citation and quotation marks omitted)).  That said,

> It is well established that the Constitution does not guarantee that a prisoner will be placed in any particular prison. Moreover, an inmate does not possess a protected liberty interest in preventing a transfer to a more restrictive form of confinement. Neither does state law provide a protected liberty interest with respect to such transfers. Indeed, the substantial deference given to prison officials in the discretionary exercise of their duties includes decisions regarding the placement and transfer of prisoners within the correctional system.

*Schofield*, 769 F. Supp.2d at 48-49 (internal citations and quotation marks omitted).

IV. <u>Facts</u>.

A. <u>Conditions in the Segregation Units</u>.

Perry asserts that during the 611 days he was in an SMU he was alone in a windowless cell for either 23 or 24 hours most days. (#110 ¶ 72.) SMU cells had doors comprised of bars that were four inches apart. Each cell also had a separate solid steel door that could be closed. If the solid door was closed, "Perry could not even see other people or speak to other inmates through the cell doors." *Id*. Perry asserts that his mental health records show that he was placed on "solid door status," meaning that the solid door was closed, and that the superintendents approved the status. He also claims that "his mental health files note that solid door status was, at times, contraindicated and yet still used."[7] *Id.*

The rules of the SMU provide that inmates can leave their cells for one hour, five days a week, in order to exercise in an outdoor cage which is exposed to the elements. (#102 ¶¶ 71, 72; #110 ¶¶ 71, 72.) Inmates are separated in their cages so they cannot have contact. *Id*. Defendants say that inmates can also exercise in their cells but Perry disputes this because he says the cells are too small.[8] (#102 ¶ 71; #110 ¶ 71.) With a few exceptions, whenever inmates leave their cells they are under "a hands on escort" by two staff members, and they are handcuffed behind the back and in leg irons. (#102 ¶ 79.)

With exceptions for personal and legal visits, showers, medical and mental health appointments and occasional barber appointments, SMU inmates spend the remainder of their time

---

[7]

It is unclear from the record how long Perry was on "solid door status."

[8]

Perry states that at MCI-Cedar Junction his cell was so small that he could stand in the middle of it, stretch out his arms, and touch both sides of the cell, and that the furniture was bolted down so that it could not be moved, so that there was no room to exercise. (#110 ¶ 71.)

in their cells. (#110 ¶ 72.)  Personal visits are limited to two one-hour non-contact visits each week. (#102 ¶ 73; #110 ¶ 73.)  Legal visits are unlimited.  *Id.*  SMU inmates have the opportunity to shave and shower three times a week, and Perry states that laundry services were offered "oftentimes one time per month," which was less than in general population, which is twice a week.  (#102 ¶ 81; #110 ¶ 81.)   Inmates are permitted two personal calls for a total of fifteen minutes per week and unlimited attorney calls, although Perry states that the process for making attorney calls was troublesome and he had difficulty calling his attorney. (#102 ¶ 85; #110 ¶ 85.)

While SMU inmates are served the same food as general population inmates, they eat alone in their cells. (#102 ¶ 72; #110 ¶ 72.)  Meals are served "via the cell food slot," that is, staff slide trays into each cell through a slot in the door.  (#102-26 at 2.)   Fewer canteen items are available to SMU inmates compared to general population inmates.  (#102 ¶ 74; #110 ¶ 74.)

While in the SMU, inmates are unable to participate in collective activities such as educational, vocational or rehabilitative programs available to general population inmates. (#110 ¶ 79.) SMU inmates cannot hold jobs as general population inmates can. *Id.*  Inmates in the SMUs have access to legal materials and legal reference materials, reading materials and the opportunity to borrow reading materials from the institutional library.[9]  (#102 ¶¶ 83, 84; #110 ¶¶ 83, 84.)

SMU inmates' interaction with DOC staff members is limited to when rounds are conducted. (#110 ¶ 58.) While in the SMU, inmates are able to submit sick slips to be seen for medical or mental health issues and attend regularly scheduled medical or mental health appointments. (#102 ¶ 67; #110 ¶ 68.) Medical or mental health staff make rounds in the SMU, as do DOC staff and

---

[9]

Perry states that availability of books and law materials was very limited. (#110 ¶¶ 83, 84.)

clergy members.[10] (#102 ¶¶ 67, 68; #110 ¶¶ 67, 68.)

In contrast, in general population inmates generally are permitted to be out of their cells for seven to eight hours per day. (#110 ¶¶ 71, 85.) They have access to both indoor and outdoor recreational areas for team sports, lifting weights, and running around a track, a law library, and common areas with televisions and tables for playing games. (#110 ¶ 71.) They eat together in one space and can socialize during meals. (#110 ¶ 72.) Prisoners in general population are able to meet and communicate with staff whenever they are out of their cells. (#110 ¶ 58.) They can hold jobs (#110 ¶ 79); they have access to telephones any time they are out of their cells (#110 ¶ 85); they can participate in programs for drug treatment and education, among other programs (#110 ¶ 78); they can attend religious services (#110 ¶ 68); and they may have contact visits. (#110 ¶ 73.)

## B. The DOC's Classification Process.

### 1. Classification Process in General.

Inmates undergo an initial classification process upon commitment to the DOC. (#102 ¶ 15; #110 ¶ 15.) This classification, and any later reclassification, is done pursuant to regulation, 103 CMR 420, and the Objective Classification Manual. *Id.* Reclassification occurs at least annually and includes review of an inmate's custody level and compliance with the personalized program plan or recommendations.[11] *Id.* DOC's Central Classification Division renders final classification decisions, which include the decision to place an inmate out of state. (#102 ¶ 18.) Perry disputes

---

[10]

Perry states that it was difficult to submit sick slips (#110 ¶ 67), and that he is Jewish and did not ever see a rabbi making rounds in the SMU. *Id.* at ¶ 68.

[11]

Perry denies that he was ever provided with a personalized program plan or recommendations. (#110 ¶ 15.)

these statements, claiming there is no admissible evidence to support them.[12]

2. Security Threat Groups.

A Security Threat Group (STG) is a gang or inmate organization that poses a threat to the safety of the public, the staff, or the secure operation of an institution. (#102 ¶ 27; #110 ¶ 27.) When deciding where an inmate will be placed, authorities consider whether the inmate is in one of these groups.[13] (#102  ¶ 28.)

The process of identifying an inmate as a member of an STG typically begins with the staff at the institution where the inmate is located - generally an investigative unit in the institution called Inner Perimeter Security (IPS) - gathering information. (#102 ¶ 34; #110 ¶ 34.) IPS forwards its findings to the Office of Investigative Services (OIS) for review. (#102 ¶ 30; #110 ¶ 30.) OIS reaches out to law enforcement and other facilities to verify the information. *Id.*   If the Chief of OIS finds the information sufficient, a letter is sent to the inmate informing him that he has been identified as a member of an STG. (#102 ¶ 31; #110 ¶ 31.) The inmate can then request a meeting with the Chief of OIS to dispute the identification.[14]  *Id.* After the meeting, the Chief of OIS makes a final decision whether to affirm that the inmate is an STG member; OIS sends the inmate a letter

---

[12]

Perry disputes defendants' explanations as to how the procedures were executed. He also asserts that the findings and opinions of the decision makers are not fact. As defendants note, however, statements in affidavits do constitute admissible evidence for purposes of summary judgment.  Further, in many instances, facts asserted by defendants are offered not for the truth of the matter asserted, but rather to show what information defendants had when making decisions with respect to Perry's placements.

[13]

In this Order the terms "STG" and "gang" are used interchangeably.

[14]

Perry states that once it was confirmed that he was a member of an STG, he was told there was no way to reverse the designation even though other inmates were offered the opportunity to disassociate  from STGs. (#102 ¶ 31.)

notifying him of the final decision.[15]  *Id.*

      3. <u>Process for Placing Inmates Out of State and Other Institutional Placements</u>.

      The County, Federal and Interstate (CFI) Unit, which is part of the Classification Division, makes referrals for  DOC inmates classified for placement outside the DOC (such as institutions run by the Federal Bureau of Prisons and other states), as well as evaluating other agencies' referrals for inmates to be housed in Massachusetts.[16] (#102 ¶ 36; #110 ¶ 36.) Pursuant to 103 CMR 423, inmates awaiting out-of-state placements are typically held in an SMU because there is no other safe housing.[17] (#102 ¶ 41.) If inmates are terminated from an out-of-state placement, they typically return to MCI-Cedar Junction and are housed in the SMU to await reclassification. (#102 ¶ 42.) After an inmate is returned from an out-of-state placement, pending reassessment, the housing assignment within the facility is at the discretion of the superintendent and deputy superintendent, who rely on information from the Central Classification Division; a significant factor is the reason for the termination by the other state. (#102 ¶ 43.) If the termination was due to security or disciplinary issues, placement in the SMU pending full review is the most appropriate placement. *Id.* After an inmate's return from an out-of-state transfer, a full new assessment is made to consider

---

[15]

      Perry disputes this statement.  He asserts that when he learned he had been identified as a member of an STG, he contacted OIS and was told that the issue needed to be addressed at the institutional level rather than through OIS. (#110 ¶ 34.)

[16]

      States exchange inmates after each state reviews the background information of inmates proposed for transfer. (#102 ¶ 38; #110 ¶ 38.)  States make decisions regarding proposed transfers based on their own criteria. *Id.* When an inmate is being screened for out-of-state placement due to STG issues, DOC considers the status of rival STGs in other states. (#102 ¶ 39.)

[17]

      Perry disputes this statement, claiming  other inmates, including those awaiting out-of-state transfer for STG issues, have remained in general population. (#110 ¶ 41.)

disciplinary issues, security issues and whether the issue that required the out-of-state placement still exists. (#102 ¶ 44.)

    4. <u>Special Management Units and Awaiting Action Status</u>.

    At all times relevant to this case, the SMUs at SBCC and MCI-Cedar Junction were operated according to the provisions of 103 CMR 423, *et seq.* (#102 ¶ 47; #110 ¶ 47.)  Administrative segregation, or awaiting action placement, in the SMU is "a temporary form of separation from general population . . . ." *See* 103 CMR 423.06; (#102 ¶ 49; #110 ¶ 49.)

    Inmates may be placed in the SMU on awaiting action status for many reasons, including pending an investigation, classification, a disciplinary matter, a placement and an out-of-state placement. (#102 ¶ 50; #110 ¶ 50.) Awaiting action placements are not indefinite as such placements end upon the occurrence of the event. (#102 ¶ 51.)  Certain requirements are imposed by 103 CMR 423 on DOC officials prior to and during an inmate's confinement in the SMU.[18] (#102 ¶ 52.)  At SBCC and MCI-Cedar Junction SMU inmates are reviewed more frequently than required by the regulations.[19] (#102 ¶ 55; #110 ¶ 55.)

---

[18]

    Inmates are screened by medical staff before placement in the SMU. *See* 103 CMR 423.08(2)(a). (#102 ¶ 52; #110 ¶ 52.)  A mental health professional interviews and prepares a written report on any inmate who is on awaiting action in an SMU for more than thirty days; a psychological assessment is made at least every ninety days thereafter. *See* 103 CMR 423.08(2)(d); (#102 ¶ 53; #110 ¶ 53.)  The status of an inmate in the SMU is  reviewed by the superintendent within seventy-two hours of the initial placement. *See* 103 CMR 423.08(2)(b); (#102 ¶ 54; #110 ¶ 54.)  The status of an inmate is reviewed every week for the first two months an inmate is in the SMU and every thirty days thereafter. *See id.*

[19]

    SBCC SMU and MCI-Cedar Junction SMU inmates were typically reviewed three days per week. At SBCC, the Deputy Superintendent of Classification and Treatment would typically attend each SMU review, along with others  including a mental health worker, and the Superintendent would be notified of the reviews. (#102 ¶¶ 56, 185; #110 ¶¶ 56, 185.) At MCI-Cedar Junction, the Superintendent and Deputy Superintendent of Classification and Treatment, a mental health worker, and other reviewers would typically attend each SMU review. (#102 ¶ 186; #110 ¶ 186.) The reviews included a discussion of the reasons why each inmate in the SMU was there, whether continued placement in the SMU was necessary, and other issues. *Id.*  Inmates were free to provide staff with any  information during their time in the SMU. (#102 ¶ 58; #110

C. Facts Specific to Perry.

1. Perry's Identification as Member of Academy Homes and Disciplinary Reports.

Defendants claim that Perry was notified by a memorandum from OIS dated November 12, 2008, that OIS had identified him as a member of the STG known as "Academy Homes."[20] (#102 ¶ 87.) Among other things, this memorandum informed Perry that he had five days to request a meeting to dispute the STG identification. (#102 ¶ 88; #110 ¶ 88.) According to a February 7, 2011 memorandum sent to Perry from OIS, he never disputed the identification and he was formally confirmed as a member of Academy Homes.[21] (#102 ¶ 89; #110 ¶ 89.) Intelligence information received by IPS at SBCC indicated the victim of the murder committed by Perry was a member of a gang known as "Walnut Park." (#102 ¶ 90.) Defendants state that, during the relevant time period, Walnut Park and Academy Homes were rival gangs, both in the Massachusetts DOC prison system and on the streets of Boston. (#102 ¶ 91.)

While in DOC custody, Perry has received multiple disciplinary reports, including several for gang-related incidents, fights, possession of weapons and matters relating to dishonesty.[22] (#102

_____

¶ 58.)

[20]

Perry disputes that he ever received the memorandum, and contends that he first learned of the alleged STG designation orally when he was moved to segregation in December of 2010. (#110 ¶ 87.)

[21]

According to Perry, the confirmation was based on information that was years-old and existed before his segregation began. (#110 ¶ 89.)

[22]

Some of Perry's disciplinary matters are as follows:

a. On September 30, 2004, at SBCC, Perry kicked an inmate who was being restrained by guards and, in the process also struck a correction officer's hand with his (Perry's) foot. Perry admitted kicking the inmate. It was found that the assault was STG-motivated. Perry received a disciplinary report for his actions and received a six-month sanction to the Departmental Disciplinary Unit (DDU). (#102 ¶ 92a.) Perry disputes that

¶ 92; #110 ¶ 92.)

2. Perry's First SMU Placement.

On December 10, 2010, the SBCC IPS Unit received an anonymous informant letter containing what appeared to be first-hand information concerning Perry. (#102 ¶ 96.) According to the letter, Perry had made threats against an inmate who was a suspected gang member; Perry said he would "get anybody" from Walnut Park in retaliation for the knife fight he had been involved in in 2008; and he said he had motivated a member of Academy Homes to attack someone from Walnut

---

the assault was found to be STG-motivated and he denies knowing the other inmate. (#110 ¶ 92a.) However, the text of the disciplinary report states that "[o]n October 1, 2004, the Souza Baranowski Correctional Center Inner Perimeter Security Unit did determined (sic) through physical evidence that inmate Perry, Jwainus W83163 did engage in ***unauthorized Security Threat Group (Academy Homes) activity***." (#110-3, emphasis added.)

b.  On November 21, 2006, at MCI-Cedar Junction, staff found a 6.5 inch steel weapon sharpened to a point in Perry's cell. (#102 ¶ 92b; #110 ¶ 92b.) Perry pled guilty to the charge of possession of a weapon/sharpened instrument. *Id.*

c.  On August 8, 2007, at MCI-Cedar Junction, staff discovered an eight inch sharpened pick-type weapon hidden in Perry's pocket. (#102 ¶ 92c; #110 ¶ 92c.) Perry pled guilty to the charge of possession of a weapon/sharpened instrument. *Id.*

d.  On January 9, 2008, at MCI-Cedar Junction, staff discovered an eight inch sharpened flat stock weapon hidden in Perry's cell. (#102 ¶ 92d; #110 ¶ 92d.) Perry pled guilty to the charge of possession of a weapon/sharpened instrument. *Id.*

e.  On October 30, 2008, at MCI-Cedar Junction, Perry stabbed another inmate in the back of his neck with a weapon. (#102 ¶ 92e; #110 ¶ 92e.) Plaintiff received a disciplinary report charging him with, among other things, aggravated assault on an inmate, possession of a weapon, and ***fighting with another person due to STG or gang activities***. Plaintiff pled guilty to these charges and received a twenty-four month sanction to the DDU. *Id.*

f. On June 25, 2009, an IPS officer conducted a search of an influential Academy Homes member and recovered a letter from "A-Dub," which is Perry's known alias. (#102 ¶ 93.)  At that time, Perry was serving his DDU sentence for stabbing a rival Walnut Park member in the neck. *Id.*  In the letter, Perry ordered the other inmate to have an unproven Academy Homes member stab a specific Walnut Park member. *Id.*  Perry disputes that A-Dub is his known alias and notes that defendants have not provided evidence to show that Perry sent the letter. (#110 ¶ 93.)

16

Park. *Id.* In fact, such an altercation had taken place between the two named inmates on November 19, 2010 at SBCC.[23] *Id.*

After receiving the letter, IPS staff placed Perry in the SMU at SBCC for the safety of the institution and to avoid a conflict between Academy Homes and Walnut Street members.[24] (#102 ¶¶ 97, 99.) Perry was placed in the SMU on awaiting action status so that defendants would have time to look into the matter and Perry's proper placement; Perry was also awaiting a classification hearing. (#102 ¶ 101.)

Before being put in the SMU Perry was cleared by medical staff. (#102 ¶ 102; #110 ¶ 102.) Central Classification determined, in light of STG concerns, that Perry could not safely be housed in general population with the DOC and that he required an out-of-state placement. (#102 ¶ 102.) Staff at SBCC concluded that, while not necessary for every inmate awaiting  out-of-state placement, in Perry's case it was necessary that he remain in the SMU to ensure the security of the institution.[25] (#102 ¶ 104.)

---

[23]

DOC staff thought the informant letter stated a credible risk based on: Perry's affiliation with Academy Homes; Perry's involvement in a stabbing of a rival Walnut Park member in 2008; the fact that Perry was serving a life sentence for the murder of an individual whom intelligence indicated was a Walnut Park member; the fact that in June 2009, a search of another Academy Homes member resulted in recovery of a letter written by Perry in which Perry ordered the Academy Homes member to have another member stab a particular Walnut Park member; Perry's disciplinary reports for hiding weapons; and the fact that in November 2010, IPS had received a request from a rival STG member to be placed on Perry's enemy list because of an STG conflict that arose from issues on the street. (#102 ¶ 100.)

[24]

Perry notes that, at the  time in question, it had not been confirmed that he was a gang member and, in any event, there could not have been an immediate concern for the security of the institution because Walnut Park and Academy Homes inmates were separated in the prison and could not interact. (#102 ¶ 99.)

[25]

Perry states that he never received any information about the alleged investigation into his STG membership and was never interviewed during the purported investigation. (#110 ¶ 112.) Perry admits, however, that he was told prior to his December 17, 2010 Classification Board that he was being held in the SMU for STG issues, that he and his attorney were aware that he was there because of STG issues and that

On December 17, 2010, a Classification Board was held at SBCC, with the Board recommending that Perry be placed at MCI-Concord, a medium-security facility, due to STG issues. (#102 ¶ 107.)

By January 2011, a report had been generated, based on information from OIS and SBCC IPS, detailing the ongoing conflict between Walnut Park and Academy Homes, which was confirmed by the Boston Police. (#102 ¶ 111.)  The report stated that an inmate at MCI-Concord was attempting to align several Boston street gangs, including Walnut Park, against Academy Homes and its associates.  Perry was identified as an influential Academy Homes member.  *Id.* On January 25, 2011, Anthony Mendonsa met with Osvaldo Vidal (Deputy Superintendent of Operations at SBCC) and an IPS officer to discuss Perry's status. (#102 ¶ 112; #110 ¶ 112.) They were of the opinion that Perry could not be safely placed into population at SBCC. (#102 ¶ 112.)

On February 4, 2011, after receiving information from staff at SBCC and from OIS that Academy Homes and Walnut Park had a long-standing feud and that there were numerous Academy Homes members and one Walnut Park member at MCI-Concord, the Commissioner's designee, Cresey, modified the classification recommendation. (#102 ¶ 114; #110 ¶ 114.) She found that Perry required a maximum security placement and rendered a final decision to screen Perry for an out-of-state placement due to security concerns. *Id.* The same day, Cresey emailed Mendonsa about the classification decision, noting that she had determined that Perry was not appropriate for placement in MCI-Concord or any other medium security facility at that time based on intelligence information from SBCC and Perry's assaultive behavior. (#102 ¶ 115; #110 ¶ 115.)

---

his attorney contacted DOC staff on December 31, 2010 to discuss the issues.  (#102 ¶¶ 105, 106; #110 ¶¶ 105, 106.)  Perry also states that he attempted to dispute that he was a gang member. (#110 ¶ 105.)

From February to April 2011 officials communicated with Perry or his attorney to keep them informed about Perry's status several times. (#110 ¶¶ 117, 120, 122.)  During his SMU placements, DOC staff members were responsive to concerns expressed by Perry's family concerning his mental health as well as Perry's inquiries regarding his status.  (#102 ¶¶ 123, 124, 126, 128, 140, 141, 142; #110 ¶¶ 123, 124, 126, 128, 140, 141, 142.)

As of July 20, 2011, authorities planned to house all inmates awaiting out-of-state placement in the SMU at MCI-Cedar Junction. (#102 ¶ 130; #110 ¶ 130.) On July 28, 2011, Perry was transferred to the SMU at MCI-Cedar Junction pending out-of-state transfer. (#102 ¶ 131; #110 ¶ 131.)

At MCI-Cedar Junction, Deputy Superintendent Abbe Nelligan conducted weekly rounds in the SMU going from cell to cell speaking to inmates about a variety of topics; Nelligan had several conversations with Perry regarding his out-of-state placement. (#102 ¶¶ 133, 134; #110 ¶¶ 133, 134.)  Nelligan kept the inmates informed as to whether other states were interested in placements. (#102 ¶¶ 135, 136; #110 ¶¶ 135, 136.)

In August of 2011, Neville asked OIS about intelligence regarding Academy Homes and Walnut Park. (#102 ¶ 137.)  Neville was informed that there was still a long-standing feud between the two groups. (#102 ¶ 137; #110 ¶ 137.)

On December 16, 2011, Perry was present when a Classification Board was held at MCI-Cedar Junction with the majority of the Board recommending a maximum-security placement. (#102 ¶ 143; #110 ¶ 143.) The Board also recommended that Perry be screened for placement in a Special Housing Unit, which is also known as a Protective Custody Unit. *Id.* A minority vote recommended placement at MCI-Concord. *Id.* Perry filed an appeal asking to be placed either at

MCI-Concord or out-of-state in New Hampshire. *Id.*

In a letter dated December 18, 2011, Perry threatened that "this matter [i.e., a possible placement at SBCC and/or in a Special Housing Unit] [would] end in <u>Bloodshed</u> and <u>tragedy</u>!!!" (#102 ¶ 144; #110 ¶ 144.) In that letter, Perry went on to state that "if the poor bastard I brutally stab several times survive[s] he's going to have a hell of a failure to protect claim against the DOC. Because if you think for one second I would allow this your [sic] sadly mistaken." *Id.*

On or about December 26, 2011, Perry and two other inmates went on a hunger strike to protest not being transferred out of state quickly enough.  (#102 ¶ 145; #110 ¶ 145.) As a result, Perry was moved to the health unit, first at MCI-Cedar Junction and then SBCC, until he accepted a meal on January 1, 2012. (#102 ¶ 147; #110 ¶ 147.)  Perry returned to MCI-Cedar Junction on January 2, 2012, where he remained in the health unit until January 9, 2012. (#102 ¶ 148; #110 ¶ 148.)  Perry was transferred back to the SMU at SBCC on January 12, 2012. (#102 ¶ 150; #110 ¶ 150.)

On January 31, 2012, Perry found out that a possible placement in Virginia was pending. (#102 ¶ 151; #110 ¶ 151.) He wrote to Neville stating he did not want to be placed anywhere outside of New England and threatened to kill himself if placed outside of New England. *Id.*

On March 23, 2012, Neville, as the Commissioner's designee, modified the classification recommendation and rendered a final classification decision to continue to screen Perry for an out-of-state placement. (#102 ¶ 154; #110 ¶ 154.) Given that intelligence indicated that other inmates were potentially at risk from Perry, not that Perry was currently at risk, a protective custody placement was not deemed appropriate. *Id.* At that time, Perry had active inmate enemies at MCI-Concord, Old Colony Correctional Center, and SBCC. *Id.*   Further, by this juncture, the State of

Connecticut had indicated it would accept Perry as an out-of-state inmate. *Id.*

3. <u>Steps Taken to Place Perry Out of State</u>.

After the decision was first made to screen Perry for an out-of-state placement in February 2011, Neville began making requests for other states to accept Perry.[26] (#102 ¶ 156; #110 ¶ 156.) Neville periodically made telephone calls to other states to inquire as to the status of their reviews. *Id.* The DOC has no control over how long other states take to review information and make decisions about out-of-state placements. (#102 ¶ 158.)

In January 2012, Virginia officials notified Neville that they were considering accepting Perry. (#102 ¶ 159; #110 ¶ 159.)  After Perry wrote the letter in January 2012 in which he stated he would kill himself if placed outside of New England, the Classification Division decided not to pursue placements outside of New England because DOC staff feared Perry would act out in order to sabotage such placements.  *Id.*

In February 2012, Central Classification staff considered whether Perry could be placed at a medium-security DOC facility, but because Boston-based street gang members could be at any DOC facility, the intelligence gathered by IPS, and Perry's history of gang-related assaults and weapons offenses while in custody, it was determined that the risk associated with Perry's possible placement in general population was too great and the need for Perry's out-of-state placement remained. (#102 ¶ 165.)

---

[26]
    The process included asking which inmates those states would refer to the DOC in return, because transfers involve one-to-one swaps, meaning Neville would review information on any inmate the other state proposed sending to Massachusetts. (#102 ¶ 156; #110 ¶ 156.) Neville referred Perry to numerous states, including Virginia, Idaho, New Jersey, Rhode Island and Connecticut. (#102 ¶ 157; #110 ¶ 157.)  Making referrals involves providing a lot of information, including STG information, disciplinary history, and medical information to the potential receiving states. *Id.*

Connecticut officials informed the DOC, by letter dated March 14, 2012, that they would accept Perry as an out-of-state inmate. (#102 ¶ 161; #110 ¶ 110.)

4. Perry's Transfer to Connecticut on March 23, 2012 and his Return to Massachusetts on September 28, 2012.

On March 23, 2012,  Perry was transferred to the Connecticut DOC. (#102 ¶ 166; #110 ¶ 166.) On September 24, 2012, Neville received an email from an official in Connecticut requesting that Perry be returned to Massachusetts because he had become a management issue, and Perry returned to Massachusetts on September 28, 2012. (#110 ¶¶ 167, 171.)

5. Perry's Placement on Awaiting Action on September 28, 2012 and Subsequent Transfer to MCI-Shirley (Medium).

When Perry returned from Connecticut he was placed in the SMU at MCI-Cedar Junction on awaiting action status pending a new classification decision. (#102 ¶ 172.) On October 31, 2012, a Classification Board was held at MCI-Cedar Junction with Perry present. (#110 ¶ 173.) The Board recommended a maximum-security placement at SBCC because Perry had been returned from Connecticut due to threatening statements and because of Perry's extensive history of negative institutional adjustment. *Id.* Perry appealed the classification recommendation, asking to be placed in the Maine DOC or MCI-Norfolk. (#102 ¶ 174; #110 ¶ 174.)

On February 15, 2013, Neville, as the Commissioner's designee, modified the October 31, 2012 classification recommendation and rendered a final decision to place Perry at MCI-Shirley (Medium), noting that the DOC needed to monitor Perry's adjustment and gang issues closely.[27]

---

[27]

Defendants state that the February 15, 2013 decision to place Perry at MCI-Shirley was made in light of many factors including Perry's history, whether there were STG concerns at particular facilities, and other factors. (#102 ¶ 177; #110 ¶ 177.) Defendants state that it was the professional judgment of Neville that Perry could not be safely housed in general population at SBCC due to ongoing gang issues, but that Perry could be safely housed at MCI-Shirley in general population with close monitoring. *Id.* The timing of this decision

(#102 ¶ 176; #110 ¶ 176.)

Perry was transferred to a general population unit at MCI-Shirley on February 19, 2013. (#102 ¶ 178; #110 ¶ 178.) At Perry's next Internal Status Review in October 2013, it was recommended that Perry remain at MCI-Shirley. (#102 ¶ 179; #110 ¶ 179.) The review found that Perry had not incurred any new disciplinary reports, had received average housing evaluations and had an institutional job. *Id.*

6. <u>SMU Reviews of Perry's Awaiting Action Status</u>.

Perry's awaiting action status was first reviewed on December 13, 2010, within 72 hours of his placement, and his status was reviewed more often than required by 103 CMR 423 throughout the entire time he was in the SMUs. (#102 ¶ 189; #110 ¶ 189.) While in the SMU at SBCC, Perry received periodic written notifications that he was on awaiting action status and that administrative reviews of his placement had been conducted.[28] (#102 ¶ 190; #110 ¶ 190.) As reflected in the SMU reviews and notifications and Mendonsa's email of April 27, 2011, for a period of time while on awaiting status at SBCC, Perry was considered by SBCC staff as both awaiting action pending investigation and pending out-of-state placement. (#102 ¶ 191; #110 ¶ 191.)  During this period, Central Classification and the facility were considering and revisiting Perry's SMU placement and

---

is curious.  In November, 2012, two months' into Perry's second stint in segregation, the Supreme Judicial Court decided *LaChance v. Commissioner of Correction*, 463 Mass. 767, 778 (2012), in which the SJC ruled that under *Sandin* it was unconstitutional for an inmate to be held for 10 months in administrative segregation on awaiting action status without a hearing and opportunity to be heard, and that in the future "in no circumstances may an inmate be held in segregated confinement on awaiting action status longer than ninety days without a hearing." *Id.* at 777.  Defendants note that the DOC took steps immediately after the issuance of the *LaChance* decision to comport with the SJC's new requirements, and that Perry was transferred out of segregation and into general population at MCI-Shirley in Shirley, Massachusetts, on February 19, 2013, prior to his *LaChance* hearing date. (#101 at 20.)

[28]

Perry disputes that the notifications advised him that administrative reviews of his status had been conducted. (#110 ¶ 190.)

whether the out-of-state placement was necessary.[29] *Id.*

## V. Discussion.

### A. Perry's Initial and Continued Placement on the SMU was Justified.

Perry argues that authorities had no reason to place him in an SMU in the first place, but the undisputed facts belie that contention. Prior to being placed in the SMU in December, 2010, Perry had received multiple disciplinary reports including a 2004 gang-related incident where he kicked another inmate as the inmate was being restrained by correction officers; three charges of possession of weapons from 2006, 2007 and 2008; and an incident from 2008 where he was found to have stabbed a rival gang member in the neck with a weapon. Perry pled guilty to all the disciplinary reports. With regard to the 2008 stabbing incident, Perry does not dispute that the disciplinary report to which he pled guilty charged him with, inter alia, aggravated assault on an inmate, possession of a weapon and fighting with another person due to gang activities.[30]

After pleading guilty to the 2008 assault, Perry received a sanction of 24 months in detention. Upon completion of his sentence, he was transferred to SBCC on November 18, 2010. Less than a month later, on December 10, 2010, authorities placed Perry in the SMU at SBCC based on an informant letter linking Perry to gang activity, coupled with Perry's violent history. The DOC's reasons for the transfer - to ensure the safety of the institution and to avoid conflict between

---

[29]

While Perry was in the SMUs - December 2010 through February 2013 - DOC staff from SBCC and from MCI-Cedar Junction periodically communicated with Neville and other staff in the Central Classification Division about Perry and the status of his classifications and out-of-state placement. (#102 ¶ 245; #110 ¶ 245.)

[30]

Although Perry claims he was not sanctioned for fighting due to STG activities, the disciplinary report to which he pled guilty specifically states that "staff reports that ***an STG (Security Threat Group) altercation*** took place in the Block 5 Housing Unit on 10-30-08." (#110-3, emphasis added.)

Academy Homes and Walnut Street members - were justified given what they knew at the time.  The conflict between Walnut Park and Academy Homes was confirmed by the Boston Police Gang Unit. Perry's arguments that statements in the informant letter were not true or that his disciplinary record was old do not raise a genuine issue of material fact on the question of the propriety of Perry's initial placement in the SMU.

Perry argues that his confinement was atypical because other inmates awaiting action or out-of-state placement were kept in general population, and because staff at the institution at times disagreed about his placement in the SMU.  These facts do not make the authorities' decisions regarding Perry atypical.  *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (judiciary is "ill equipped to deal with the difficult and delicate problems of prison management" and so courts defer to prison administrators' decisions regarding security); *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126 (1977) ("Because the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators").

Although Perry suggests that the reasons for his initial and continued SMU placement were pretextual, he has presented no facts to support this assertion. In sum, there are no facts or reasonable inferences sufficient to raise a genuine issue on the propriety of placing and keeping Perry in the SMUs.[31]

---

[31]

Perry relies on a May 2011 email where Dickhaut refers to Perry as a "squeaky wheel" as evidence of pretext.  Perry argues that the comment means he was placed in the SMU  because he was outspoken.  The comment in the email cannot carry the weight that Perry gives it. The email is dated well after Perry had been approved for out-of-state placement.   Central Classification was responsible for the decision to continue out-of-state placement, not Dickhaut. Moreover, in May of 2011, OIS and SBCC IPS were still voicing the opinion that Perry could not live in general population in SBCC.

B. <u>The Law Concerning Whether Perry's Placement in the SMU Triggered a Liberty Interest is Unclear</u>.

Even if the authorities were justified in placing him there, the question remains whether Perry's continued placement in the SMU triggered a liberty interest and if it did, what kind of process should have been afforded to him. *See Skinner v. Cunningham*, 430 F.3d 483, 486-87 (1st Cir. 2005). In the context of prisoners' rights, this is a complicated question. Neither the Supreme Court nor the First Circuit has established a baseline against which the parameters of "an atypical and significant hardship" are to be measured. *See Wilkinson*, 545 U.S. at 223. In *Skinner*, the First Circuit found that immediate transfer to solitary confinement after an inmate had just killed another inmate did not give rise to a due process clause claim, given the authorities' pressing need to isolate the inmate from other prisoners. *Skinner*, 430 F.3d at 486-87. The inmate's "more colorable" claim was that he was kept there for 40 days without process, but the court found that in the circumstances of the case, a 40-day placement without a hearing was not unconstitutional. *Id.* at 487. While noting that there was disagreement among the circuits concerning to what the confinement conditions of a segregation unit should be compared for purposes of *Sandin's* "hardship test," the court did not decide the issue. *Id.*

As for other circuits' holdings, the Court of Appeals for the District of Columbia recently surveyed "the current state of the law":

> The Third, Sixth, and Tenth Circuits all generally look to administrative confinement as the baseline. *See*, *e.g.*, *Griffin v. Vaughn*, 112 F.3d 703, 706-08 (3d Cir. 1997) (finding no liberty interest for inmate who, suspected of raping a prison guard, was placed in administrative confinement for fifteen months because inmates can reasonably expect to be placed in administrative confinement during their sentence); *Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir. 1998) (finding no liberty interest for inmate placed in administrative segregation for thirty months pending investigation for murder of a prison guard as segregation during investigation is not atypical and was justified); *Gaines v. Stenseng*, 292 F.3d 1222, 1224-26 (10th Cir.

2002) (remanding to district court to compare conditions in disciplinary segregation to those in administrative segregation).

> The Fifth Circuit, on the other hand, has held disciplinary segregation can never implicate a liberty interest unless it 'inevitably' lengthens a prisoner's sentence, *see Carson v. Johnson*, 112 F.3d 818, 821 (5th Cir. 1997), and that administrative segregation - being an ordinary incident of prison life - is essentially incapable of creating a liberty interest, *see Orellana v. Kyle*, 65 F.3d 29, 31-32 (5th Cir. 1995). The Seventh Circuit also has adopted a high standard, holding the baseline is not just the conditions of confinement within that particular prison, but those at the harshest facility in the state's most restrictive prison. *See Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997). By contrast, the Fourth Circuit looks to the general population as the baseline. *See Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997). And the Second Circuit requires a fact-specific determination that compares the duration and conditions of segregation with conditions in both administrative confinement and the general population. *See, e.g.*, *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997). As a result, the Second Circuit has found confinements as short as 180 and 305 days create a liberty interest under *Sandin*. *See Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000) (305 days)*; Kalwasinski v. Morse*, 201 F.3d 103, 106 (2d Cir. 1999) (180 days). In sum, divergences in the baseline often lead to divergences in outcome.

*Aref v. Lynch*, No. 15-5154, 2016 WL 4409356, at *7 (D.C. Cir. Aug. 19, 2016).

Notwithstanding the lack of clarity concerning to what "baseline" one should compare the conditions of a segregation unit, in *Skinner*, the First Circuit suggested that a placement of excessive duration could mean that a liberty interest was implicated. *Skinner*, 430 F.3d at 486 ("We think it is enough here that Skinner's segregation was rational, that its duration was not excessive, and that the central condition - isolation from other prisoners - was essential to its purpose."). Other courts agree that the length of time an inmate spends in isolation is relevant to whether a liberty interest is triggered. *See, e.g.*, *Wilkerson v. Goodwin*, 774 F.3d 845, 854 (5th Cir. 2014) (citing cases) ("our sister circuits have considered the severity of the restrictive conditions and their duration as key factors in analyzing whether those conditions constitute an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'"); *Aref*, 2016 WL 4409356, at *8

("duration [of segregation] itself is widely regarded as a crucial element of the *Sandin* analysis").

There is, however, no consensus regarding what length of time in segregated confinement is required to implicate a liberty interest. *Compare Morefield v. Smith*, 404 Fed. Appx. 443, 446 (11th Cir. 2010) ("While Morefield's four-year confinement in administrative segregation was lengthy, it did not tip the balance in favor of establishing a liberty interest when weighed against other factors in his case - the conditions of his confinement were generally equivalent to general prison population conditions and the length of his stay in administrative segregation did not extend the length of his sentence"); *Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008) (no liberty interest arising from protective lockdown lasting 12 months); *Jones v. Baker*, 155 F.3d 810, 812-13 (6th Cir.1998) ("administrative segregations have repeatedly been held not to involve an 'atypical and significant' hardship implicating a protected liberty interest without regard to duration," in this instance two and a half years); *Griffin v. Vaughn*, 112 F.3d 703, 708 (3d Cir. 1997) ("we believe that exposure to the conditions of administrative custody for periods as long as 15 months . . . did not deprive [plaintiff] of a liberty interest"), *with Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*").

There is no question that Perry's two placements in SMUs, which lasted approximately fifteen months and five months, (with a six-month hiatus in the Connecticut DOC inbetween), were prolonged.   Defendants contend that Perry's placements in the SMU were not "indefinite" in the sense that they would end upon a particular occurrence, i.e., an out-of-state placement or reclassification, but it seems a misnomer to claim that a time period is not "indefinite" when in fact

it is so protracted.

Although the conditions on the SMUs were significantly more restrictive than those in general population, and Perry spent a very long time housed in SMUs, the law is simply unclear as to whether Perry had a liberty interest in not being placed there.  Even assuming a liberty interest was triggered, the DOC asserts that Perry was provided with adequate process.  As set out above at great length, the DOC certainly had many rules and regulations pertaining to placing and keeping inmates on SMUs, and for the most part, at least, followed these rules with regard to Perry: reviews were held regularly; the Classification Board reexamined Perry's situation periodically with updated intelligence received from OIS and SBCC IPS; Perry received written notifications that he was on awaiting action status and that administrative reviews of his placement had taken place; Perry filed a number of grievances concerning his placement in SMU, all of which were addressed, as were the concerns of his family and attorney.[32]

Perry asserts that the DOC did not follow its regulations, and that was entitled to a hearing to contest the reasons for his placement (#111 at 10).   With no clear guidance from the courts prior to his placement, however, as to whether his placement even triggered a liberty interest, never mind what process was due, it cannot have been a violation of his due process rights for the DOC to have followed the procedures they did.  Even the SJC in *LaChance*, while finding that prisoners in Perry's situation have a federal constitutional right to a hearing, concluded:

> to this point, neither State nor Federal law has clearly articulated the outer limit of what constitutes 'reasonable' segregated confinement on awaiting action status

---

[32]

Perry filed several grievances complaining about his placement in the SMU in December 2010, his retention in the SMU from December 2010 and through February 2013, and the decision to place him out of state. (#102 ¶¶  225-242; #110 ¶¶  225-242.)

without the safeguards of procedural due process.  Because we announce today *for the first time* that segregated confinement on awaiting action status for longer than ninety days gives rise to a liberty interest entitling an inmate to notice and a hearing, we conclude that it would not have been clear to reasonable officers in 2006 that their behavior violated LaChance's right to due process.

*LaChance v. Commissioner of Correction*, 463 Mass. 767, 778  (2012) (emphasis added). Thus the

*LaChance* court, while setting out a bright line rule that holding an inmate for ninety days or more

on awaiting action status without a hearing is a violation of due process, also concluded that based

on the uncertainties of the law prior to its decision, defendants were entitled to qualified immunity.[33]

*See id.* at 777-78.

The court need not rule here on the question of whether a liberty interest was implicated and

what process was due because defendants are entitled to qualified immunity.   Whether a

constitutional right not to be held in SMUs for extended periods of time without proper procedure

was clearly established  at the time of the defendants' purported violation is a question of law for

the court to decide.  *St. Hilaire v. City of Laconia*, 71 F.3d 20, 24 (1st Cir. 1995).  The First Circuit

has parsed the issue into two elements: Whether the right was clearly established such that

reasonable DOC employees in defendants' shoes would have understood that their actions violated

that right and, on the facts of this case, whether reasonable DOC employees would have understood

that their actions violated that right. *Stamps*, 813 F.3d at 33-34.  In conducting the analysis, the court

must consider both "the clarity of the law in general at the time of the alleged violation; and []the

clarity of the law as applied to the case – in other words, whether a reasonable person in the

---

[33]

     Perry asserts that any period after the *LaChance* decision during which Perry was held in segregation without a hearing equated to a violation of his due process rights. As noted above, defendants state that the DOC took steps immediately after *LaChance* was decided to comport with the SJC's new requirements, and that Perry was transferred out of segregation and into general population at MCI-Shirley in Shirley, Massachusetts, on February 19, 2013, prior to his *LaChance* hearing date. (#101 at 20.)

defendant's shoes 'would have understood that his conduct violated the plaintiff['s] constitutional rights.'" *Raiche*, 623 F.3d at 35-36 (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)); *Plumhoff v. Rickard*, - U.S. -, 134 S. Ct. 2012 (2014) ("a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it").

The Supreme Court has cautioned that "clearly established law" should not be defined at a "high level of generality," and that the "dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'" *Mullenix v. Luna*, - U.S. -, 136 S.Ct. 305, 308 (2015) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *Calluna v. Eastman*, No. 13-CV-13300-ADD, 2016 WL 4148197, at *3-4 (D. Mass. Aug. 4, 2016). "In other words, existing precedent must have placed the . . . constitutional question beyond debate." *Carroll v. Carman*, - U.S. -, 135 S.Ct. 348, 350 (2014) (internal citation and quotation marks omitted).

In sum, during the time period at issue here, the state of the law with regard to whether an inmate in Perry's circumstances, i.e., an inmate held in administrative segregation, had a federal constitutional liberty interest at stake was murky. Neither the Supreme Court nor the First Circuit has squarely ruled on the issue. Given the variety of approaches employed by circuit courts in analyzing the question, as well as the wide range of different decisions that have resulted, it cannot be said that the liberty interest, and, therefore, "the [constitutional] right was clearly established at the time of the challenged conduct." *Marrero-Mendez*, 2016 WL 3902635, at *3 (internal citations and quotation marks omitted). Reasonable DOC employees in defendants' shoes would not have known that plaintiff had a liberty interest and, consequently, a constitutional right, at stake. Accordingly, defendants are entitled to qualified immunity on the procedural due process claim in

Count I.

V. <u>Conclusion and Order</u>.

For all of the reasons stated, it is ORDERED that Defendants' Motion For Summary Judgment (#100) is ALLOWED.  Judgment shall enter for defendants.


September 30, 2016                                    /s/ M. Page Kelley
                                                     M. Page Kelley
                                                     United States Magistrate Judge